Robert W. JACKSON, III, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

Nos. 439, 1995, 450, 1995.

Supreme Court of Delaware.

Submitted: Sept. 17, 1996.
Decided: Oct. 22, 1996.
As Corrected Oct. 29, 1996.

Kevin J. O'Connell, (argued), and Thomas A. Foley, Wilmington, for Appellant.

Timothy J. Donovan, Jr., (argued), and William E. Molchen, Deputy Attorneys General, Wilmington, for Appellee.

Before VEASEY, C.J., WALSH, HOLLAND, HARTNETT, and BERGER, JJ., constituting the Court en Banc.

WALSH, Justice:

The appellant Robert W. Jackson, III ("Jackson"), has again brought a death penalty appeal before this Court, following a second penalty hearing in which the death sentence was imposed. On March 30, 1993, Jackson was convicted of First Degree Murder (2 counts), Possession of a Deadly Weapon During the Commission of a Felony (3 counts), Burglary Second Degree, Conspiracy Second Degree, and Robbery First Degree, all related to the April 3, 1992, robbery and murder of Elizabeth Girardi. Pursuant to 11 *Del.C.* § 4209(b)(1), a separate penalty

hearing was conducted, at the conclusion of which the jury, by a vote of 11 to 1, recommended the death penalty. After careful consideration of the factors enumerated in 11 *Del.C.* § 4209(d), the Superior Court concurred with the jury findings and imposed a sentence of death.

Jackson appealed his convictions to this Court which affirmed the convictions but vacated the death sentence and remanded the matter for a new penalty hearing. *Jackson v. State*, Del.Supr., 643 A.2d 1360 (1994) ("*Jackson I*").[1] The Superior Court conducted a second penalty hearing before a new jury which unanimously found that the State had established, beyond a reasonable doubt, two statutory aggravating circumstances [2] and, by a vote of 11 to 1, found that the aggravating circumstances outweighed the mitigating circumstances. 11 *Del.C.* § 4209(c)(3). Again, the Superior Court considered the jury's recommendation and determined the death sentence to be appropriate. This appeal followed.

## I

In this appeal Jackson raises six issues which were previously raised and rejected by this Court on his first appeal.[3] He alleges that the trial court: (1) failed to provide him with an impartial jury by striking jurors for cause who held reservations about imposing the death penalty; (2) failed to preclude his sneakers, seized without a warrant at the time of his arrest, from being admitted into evidence; (3) failed to suppress other evidence collected by way of a warrant during a nighttime search of his residence; (4) failed to suppress the testimony of a State's witness, Anthony Lachette; (5) abused its discretion in permitting the testimony of Detective Scott McLaren; and (6) imposed the death penalty for felony murder contrary to his rights under the Eighth and Fourteenth Amendments.

■ These claims of error were previously resolved by this Court in *Jackson I* and those rulings constitute the "law of the case" for all subsequent proceedings. *Bailey v. State*, Del.Supr., 521 A.2d 1069, 1093 (1987). Thus, their reconsideration is precluded in this appeal. In addition to those issues, now barred from further review, Jackson has raised six new claims which will be separately addressed.

## II

■ Jackson first contends that his rights as declared under *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) and its progeny, were violated during the second penalty hearing when the trial judge struck ten prospective jurors for cause on account of their apparent opposition to the death penalty. Although submitted to this Court as one issue, Jackson in essence alleges two distinct errors of law. He first attacks the need to "death qualify" a jury under Delaware's new death penalty statute.[4] Second, Jackson alleges the trial court erred by striking for cause several jurors who did

1. Our vacation of the previous sentence was based on a violation of Jackson's Sixth Amendment right to counsel. The violation concerned tapes of a telephone conversation in which Jackson had solicited a cell mate, Victor Talmo, to murder a key witness who was scheduled to testify against him. We determined that Jackson's Sixth Amendment right to counsel had attached and that Talmo was acting as a state agent when the conversations were recorded. We ruled that the tapes were improperly admitted as evidence in the hearing.

2. Although the State had alleged two statutory aggravating factors, each independently proven beyond a reasonable doubt, the trial judge considered them as one aggravating factor since the murder occurred during the course and in furtherance of the commission of a felony. *See* 11 *Del.C.* § 4209(e)(1)j.

3. The prior history of this appeal including the circumstances surrounding Jackson's convictions, are entirely set forth in *Jackson I*.

4. On November 4, 1991, the Governor signed and enacted into law Senate Substitute 1 for Senate Bill 79. This revision of Delaware's death penalty statute altered the respective roles that the judge and jury heretofore played in the sentencing phase of a capital murder trial. Under the new law the jury functions only in an advisory capacity, while the trial judge has the ultimate responsibility for determining if a defendant should be sentenced to death or life imprisonment. 68 Del. Laws Ch. 189 (codified at 11 *Del.C.* § 4209).

not state unequivocally that they could never impose the death sentence. This Court has made it clear that under Delaware's present death penalty statute the jury must be "death qualified." *State v. Cohen*, Del.Supr., 604 A.2d 846, 855 (1992). Despite our prior ruling, Jackson contends that because the jurors function only as an advisory body there is no constitutional basis for striking "death objecting" jurors for cause. It is argued that the striking of such jurors for cause denied Jackson a jury comprised of a fair cross-section of the community, thereby violating his Sixth and Fourteenth Amendment rights under the United States Constitution.

As stated previously in *Cohen*, we find no merit to this proposition and perceive of no basis to reexamine our prior holding. Jurors in a capital case, although not the final sentence arbiters, sit as the conscience of the community in determining whether the death penalty is the appropriate punishment and through their recommendation, play an integral role in the sentencing result. *Cohen*, 604 A.2d at 856; *Witherspoon*, 391 U.S. at 510, 88 S.Ct. at 1770. Any personal prejudices concerning the death penalty which would seriously impair a juror's ability to perform his duty, under the instructions given by the trial judge, are impermissible and contrary to legislative intent as reflected in the death penalty statute.

■ Having established the need to "death qualify" a jury, we now turn to the level of proof which must be established before a potential juror can be struck for cause. Jackson claims the trial court committed error when, during the second penalty hearing, it struck several jurors for cause who had not made it unmistakably clear they could never, under any circumstance, impose a sentence of death. Although Jackson's characterization of the juror's statements may be accurate his recitation of the law is not. In

Delaware, a juror in a capital case may be excused for cause when that juror's views on the death penalty would prevent or "substantially impair" the performance of his duties in accordance with the court's instructions and the juror's oath. *DeShields v. State*, Del.Supr., 534 A.2d 630, 634 (1987), *cert. denied*, 486 U.S. 1017, 108 S.Ct. 1754, 100 L.Ed.2d 217 (1988); *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985). Juror bias need not be proved with unmistakable clarity, for the individual juror may not know how he or she will react when faced with imposing the death sentence or he or she may simply be unable to articulate their true feelings. *Id.* at 424–425, 105 S.Ct. at 852–853. In the formation of that calculus, the role of the trial judge who observes a juror who may be "wrestling with his conscience" is paramount. It is for this reason that we review such rulings under an abuse of discretion standard. *Sullivan v. State*, Del.Supr., 636 A.2d 931, 939 (1994).

■ During the second penalty hearing, each prospective juror was asked by the court if he or she held any bias which would prevent the juror from performing his or her duty as a juror. Six of the ten jurors struck for cause answered unequivocally that they would be unable to impose the death sentence regardless of the evidence produced at trial.[5] Two of the four remaining jurors in question, Nixon and Kerrigan, although answering the court in a somewhat ambiguous fashion, concluded that they would be unable to impose the death sentence.[6] Thus, of the ten excusals for cause challenged by Jackson, only two, jurors Clapp and Bricotto, responded to the court's questioning in a less than emphatic manner.

Clapp was questioned extensively by the trial court in an effort to determine her position on the death penalty. Clapp tendered an equivocal response to each question and appeared to vacillate on whether she

---

5. Of the six potential jurors, two equated the death penalty with murder, three objected to the death penalty on religious grounds and one just "did not believe in the death penalty." Each answered the trial court with definitive statements indicating an inability to impose the death penalty under any circumstance.

6. Prospective juror Nixon told the court that she could not judge other people and therefore could not impose either the sentence of death or life imprisonment. Potential juror Kerrigan believed her religious beliefs would prevent her from recommending the death penalty even if the evidence warranted such a result.

could sentence a person to death. Ultimately, Clapp was stricken for cause when she informed the trial court that exposure to graphic material concerning Jackson's crimes might so inflame her as to make it impossible for her to render an impartial and fair verdict. Potential juror Bricotto was doubtful of her ability to vote in favor of the death penalty. Bricotto was not opposed to the death penalty *per se*, but was unsure if she could personally take part in a life or death decision making process. Eventually the trial court excused her for cause, noting her inability to formulate a definitive response to the questioning.[7]

The function of the trial judge during *voir dire* examination of jurors is to ascertain the presence of juror bias based on determinations of credibility which cannot be easily discerned from an appellate record. *Wainwright,* 469 U.S. at 429, 105 S.Ct. at 854–855. It is this process which Jackson seeks to invalidate. However, a review of the procedure used by the trial court reveals that each juror was subject to extensive examination and excused only after the court was satisfied that he or she was unsuitable for service on the jury. Contrary to Jackson's assertions, juror bias need not be proven with unmistakable clarity and a bright-line test for determining an unacceptable response has yet to be formulated. *Id.* at 424–425, 105 S.Ct. at 852–853. Determinations of juror bias depend on the trial court's assessment of the potential juror's demeanor, credibility and state of mind. It is for this reason that we accord deference to the trial court's findings. *DeShields,* 534 A.2d at 636. We conclude that the trial court's determination as to the ten stricken jurors' inability to "substantially perform" their duties to be amply supported by the trial record and, in this regard find no error.

### III

#### A.

During the second penalty hearing the State presented evidence that following his arrest, Jackson was incarcerated in Gandor Hill prison and while there, solicited two fellow inmates to murder key State witness James Burton ("Burton"). One of these inmates was Victor Talmo ("Talmo"), who was incarcerated in default of bail and awaiting trial on burglary charges. On September 18, 1992, Talmo's girlfriend contacted New Castle County police detectives and informed them of Jackson's plans to murder Burton. That same day two detectives went to interview Talmo in prison. During this initial meeting Talmo told detectives that on September 8, and again on September 10, Jackson had discussed with him the murder of Burton. Jackson told Talmo that he would, through Jackson's mother, provide Talmo with bail money if, upon release, Talmo would kill the State witness.

Based on the September, 1992 prison meetings with Talmo, police detectives contacted prosecutors and prepared an application for a wiretap on the telephone of Jackson's mother. However, this plan was abandoned when, on September 24, 1992, police were contacted by Andre Johnson ("Johnson"). Johnson told police that he too had been solicited by Jackson to murder Burton and turned over to detectives a letter discussing, in code, Burton's death together with a photograph of Burton and a map of his residence. Because it appeared that Jackson had chosen to use Johnson as his accomplice rather than Talmo, the plan to wiretap the phone of Jackson's mother was abandoned. Following this decision, police had no further contact with Talmo until February, 1993.

On February 15, 1993, Talmo was released on bail and subsequently received a letter from Jackson concerning the murder of Burton. Similar to the package sent Johnson, this letter was coded, contained a picture of Burton and directions to Burton's residence. Through previous conversations, Talmo knew that shortly after his release from prison Jackson would be sending him such a letter.

---

7. Upon the conclusion of Bricotto's testimony defense counsel stated, "[f]or the record, I think the court did everything it could to get her to commit one way or the other, but she equivocated so much that I don't know that she clearly stated that she would be substantially impaired from answering the question in the affirmative."

Upon receipt, Talmo turned the letter over to his attorney, who later contacted police in March of 1993. In return for his cooperation, the State entered into a favorable plea agreement with Talmo regarding his pending burglary charge.[8]

The attempt to arrange the murder of a State witness was used at the second penalty hearing to demonstrate Jackson's violent propensities and was considered by the trial court to be a non-statutory aggravating circumstance. Jackson contends that Talmo was a State agent who deliberately elicited incriminating statements from him in violation of his Sixth Amendment right to counsel. Jackson claims the letter, map, photograph and all of Talmo's testimony was inadmissable on Sixth Amendment grounds.

### B.

■ To succeed on this claim, Jackson must demonstrate that Talmo was both acting as a state agent and deliberately solicited the incriminating statements from Jackson.[9] A review of the Supreme Court's significant Sixth Amendment right to counsel decisions, illustrates the difficulty in defining the term "State agent." Rather than attempting to create a uniform test for determining State agency, the Court has chosen instead to focus on the information gathering conduct. *Massiah v. United States*, 377 U.S. 201, 206, 84 S.Ct. 1199, 1203, 12 L.Ed.2d 246 (1964) ("deliberately elicited"); *Brewer*, 430 U.S. at 399, 97 S.Ct. at 1240 ("set out to elicit"); *Moulton*, 474 U.S. at 176, 106 S.Ct. at 487 ("knowingly circumventing the right to counsel"). A common thread woven throughout these decisions is the prevention of secret interrogations conducted by "investigatory techniques that are the equivalent of direct police interrogation." *Kuhlmann v. Wilson*, 477 U.S. 436, 459, 106 S.Ct. 2616, 2630, 91 L.Ed.2d 364 (1986). This Court has also noted that "conversations with secret informants pose a greater imposition upon a defendant than overt police interrogation because the defendant does not know he is being interrogated by a government agent." *Jackson*, 643 A.2d at 1375.

■ Contained in our decision remanding this issue to the Superior Court, was a list of factors to be considered when making the determination as to whether Talmo was a State agent at the time he received the incriminating evidence from Jackson. As we noted in *Jackson I*, there is no bright-line test for determining whether an individual is a government agent and the factors listed do not represent an exhaustive list of permissible considerations. *Id.* We do however, find these factors to be particularly applicable to the present appeal and will apply them in reviewing the trial court's determination that Talmo was not acting as a State agent.

The four points of inquiry are: (1) whether there was an agreement between the police and Talmo; (2) the content and scope of any agreement; (3) whether the police provided direction or instructions to Talmo; and (4) whether there was prearranged or ongoing cooperation between Talmo and the police. *Id.* at 1376; *see United States v. Johnson*, 10th Cir., 4 F.3d 904, 911–12 (1993). For purposes of this appeal, the critical time frame to be examined is from the September 21, 1992, initial meeting between the police and Talmo, and late February 1993 when Talmo received the incriminating letter from Jackson. If during this time frame Talmo

---

8. Because of his long criminal history, Talmo was faced with the possibility of being declared an habitual offender, a classification which would subject him to non-mandatory life imprisonment if found guilty of burglary. As a result of cooperating with police Talmo accepted a plea agreement, as an habitual offender, under which he would only serve 30 months incarceration.

9. The State concedes that Jackson's Sixth Amendment right to counsel had attached prior to his initial contacts with Talmo. Thus, the focus shifts to whether Talmo was a state agent and the specifics of his conduct. The Supreme Court has made it abundantly clear that the right to counsel attaches once judicial proceedings have been initiated against a defendant. *Brewer v. Williams*, 430 U.S. 387, 398, 97 S.Ct. 1232, 1239, 51 L.Ed.2d 424 (1977). For it is at this point in the proceedings that " 'the government has committed itself to prosecute, and ... the adverse positions of the government and the defendant have solidified.' " *Maine v. Moulton*, 474 U.S. 159, 170, 106 S.Ct. 477, 484, 88 L.Ed.2d 481 (1985). A more complete analysis of the Sixth Amendment right to counsel can be found in our opinion stemming from Jackson's first appeal. *Jackson*, 643 A.2d at 1370.

was acting as a government agent and deliberately solicited the contested evidence, he did so in violation of Jackson's Sixth Amendment right to counsel.

■■■■ During the first meetings between Talmo and police in late September 1992, the detectives did not offer a deal to Talmo nor did they provide him with any directives. During these meetings Talmo reported to police that Jackson had, without solicitation, approached him concerning the murder of Burton. While these meetings may have served to cast Talmo as an informant, a police informant is not necessarily a state agent for all purposes. *Johnson,* at 912. Detective McLaren, the State's chief investigative officer, testified that no agreement of any kind was reached between himself and Talmo.[10] This lack of agreement is evidenced by the fact that, subsequent to the meeting with McLaren, Talmo remained incarcerated until he was able to post bail in February 1993, six months after his last contact with police. Moreover, the record fails to reflect any contact between Talmo and police after the September 21, 1992 meeting, until his attorney contacted police with the letter received from Jackson.

■■■■ Despite the lack of police direction, we note the likelihood that Talmo appreciated an opportunity to assist police with the prosecution of Jackson as a way of improving his own position. The Sixth Amendment, however, serves to prevent government officials from violating a defendant's constitutional right to counsel and does not protect a defendant against private individuals who wish to profit at his expense. Such was the case here. Talmo successfully exploited Jackson's failed attempt to murder a State witness but did so on his own initiative and not under the direction of government officials.

Upon careful review of the record, we find that Talmo was not acting as a government agent during the relevant time period and therefore, the trial judge at the second penalty hearing was not in error by admitting into evidence the incriminating material sent from Jackson to Talmo. In view of our holding that Talmo was not a State agent, the question as to whether he deliberately solicited the letter from Jackson is irrelevant.

## IV

■■■■ Jackson next contests the denial of his motion which sought the recusal of the trial judge based on a perceived inability to be impartial in the sentencing process. Jackson's motion was posited on the fact that the trial judge, during the first penalty hearing, had heard the taped telephone conversations between Talmo and Jackson, later ruled inadmissible in *Jackson I,* concerning the murder of Burton.

The Delaware Judges' Code of Judicial Conduct reads in pertinent part:

A judge should disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, ..., where the judge has personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding.

Delaware Judges' Code of Judicial Conduct, Canon 3C. This Court has crafted a two step analysis in reviewing a trial judge's recusal decision: (i) whether, as a matter of subjective belief, the judge was satisfied that

---

**10.** Detective McLaren's testimony was as follows:

> Q: Did you, on the 21st of September, 1992, when you met with Talmo at Gander Hill, request anything of him of a future nature?
> A: No Sir.
> Q: Was there at that time; that is, the 21st of September, 1992, any agreement between you and the New Castle County Police and Talmo?
> A: No Sir, none whatsoever.

> Q: Did you provide any direction or instructions to Talmo on the 21st of September, 1992?
> A: No Sir.
> Q: Was the map, letter and photograph that you received in March of 1993 purportedly written by Jackson to Talmo, was all of that stuff received at your request? In other words, did you ask Talmo to get that stuff for you?
> A: No Sir.
> Q: Do you have any knowledge as to whether Talmo deliberately elicited the letter, map and photograph from Jackson?
> A: No Sir.

he or she could proceed to hear the case free of bias or prejudice concerning a party; and (ii) whether objectively there is an appearance of personal bias. *Los v. Los*, Del.Supr., 595 A.2d 381, 384–385 (1991). On appeal the reviewing court must be satisfied that the trial judge engaged in the subjective test and will review the merits of the objective test. *Id.* at 385. The standard of review is abuse of discretion. *Id.*

It is obvious from the trial judge's ruling on the motion, as Jackson concedes, that the judge engaged in the subjective test and determined that he could be fair and impartial at the second penalty hearing. Jackson argues, however, that the appearance of bias is so persuasive that the trial judge was required to recuse himself. We will therefore focus on the merits of the objective test.

 We are unpersuaded by Jackson's arguments and find no objective appearance of bias or prejudice. Admittedly the trial judge heard the tainted taped phone conversations during the first penalty hearing, however, at the second penalty hearing the State presented what we now hold to be constitutionally admissible evidence of the same plot. *Supra.* pp. 750–751. To serve as a disqualifying factor, the alleged bias or prejudice of the judge "must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case." *Los*, 595 A.2d at 384 (1991) *citing U.S. v. Grinnell Corp.*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). Talmo's testimony at the second trial was equally as condemning of Jackson as was his testimony at the first penalty hearing. Even without hearing the murder plot discussed in Jackson's own voice, a reasonable trier of fact could have concluded that Jackson was engaged in a plot to solicit the murder of a key State witness.

It is part of a trial judge's normal role to rule upon the admissibility of contested evidence. In the event a judge declares certain evidence to be inadmissable, the judge is

expected to exclude that evidence as a factor in any further decision making process. To require a judge to disqualify himself or herself from further participation in a case where the judge acts as a gatekeeper for the admissibility of evidence would impose an unreasonable and totally impracticable standard. A conscientious application of the subjective test by a judge faced with a recusal motion based on exposure to inadmissible evidence in the same proceeding will, in most cases, provide sufficient protection from bias. Knowledge of the content of these tapes alone does not create the appearance of bias and we find no basis to conclude that the trial judge should have recused himself from further participation in the sentencing process. *Weber v. State*, Del.Supr., 547 A.2d 948, 951–52 (1988) (judge not disqualified *per se* by prior participation).

## V

Jackson next alleges the trial court erred as a matter of law by failing to instruct the jury as to the proper burden of proof for establishing a non-statutory aggravating factor. Specifically, Jackson contends the trial court failed to instruct the jury and itself applied an evidentiary standard for non-statutory aggravating circumstances, which did not require proof beyond a reasonable doubt.[11] This claim is controlled by our decision in *Dawson*, 637 A.2d at 62–64, in which we held that "the Delaware death penalty statute does not require the State to present evidence establishing a non-statutory aggravating circumstance beyond a reasonable doubt before it may be 'found to exist.'" *See also Jackson*, 643 A.2d at 1360. Relying on our previous holding, we find no error in the trial court's use of a "credible and reliable evidence" standard of proof for determining the existence of a non-statutory aggravating circumstance.

## VI

In *Jackson I*, this Court vacated Jackson's death sentence and therefore concluded it

---

11. The State in its answering brief asserts that Jackson failed to raise this issue before the trial court and therefore, it is not a proper matter for review on appeal. Because this is a capital case,

we will consider the claim under a plain error standard of review. *Dawson v. State*, Del Supr., 637 A.2d 57 (1994).

would be improvident to conduct, at that time, our mandatory review of all death sentences to determine whether the sentenced imposed is "disproportionate to the penalty recommended or imposed in similar cases." Id. at 1381 (quoting language from 11 Del.C. § 4209(g)(2)(a)). Since the Superior Court has conducted a second penalty hearing and Jackson's claims on appeal have been found to be without merit, we will undertake our statutory obligation to review the proportionality of Jackson's death sentence. 11 Del.C. § 4209(g)(2).

In the second penalty hearing the jury by a vote of 12 to 0 found the statutory aggravating factors had been proven beyond a reasonable doubt and further determined by a vote of 11 to 1 that the statutory aggravating factors outweighed the mitigating factors. Following the jury verdict, the Superior Court carefully conducted both a qualitative and quantitative analysis relating to the totality of the circumstances surrounding the offense as well as all factors relating to the offender, his propensities, and his character.

The Superior Court determined that the State had successfully established the existence of a statutory aggravating circumstance, i.e., Jackson committed a murder during the course of and in furtherance of the commission of a felony (Robbery First Degree and Burglary Second Degree). The court also concluded the following non-statutory aggravating circumstances existed: (1) while in prison Jackson had conspired to murder a State witness who would testify against him; (2) the defendant had an extensive violent criminal history both as a juvenile and as an adult; (3) defendant previously carried a concealed deadly weapon during a violent trespassing incident; (4) that two children had their mother taken from them in a vicious and brutal manner; (5) the manner in which the killing occurred demonstrated a cold, depraved indifference to human life; and (6) the murder occurred in order to avoid detection and to silence a witness.

In assessing the mitigating factors the court found the following to exist: (1) the defendant's young age, (2) that the defendant expressed sorrow for his friends, family and the victim's family, (3) the emotional loss to the defendant's family should he be executed, (4) defendant's abusive family life, and (5) psychiatric testimony that defendant suffers from a mixed personality disorder, impulsive control disorder and substance abuse.

After according great weight to the jury findings, the Superior Court, using an independent analysis, determined that the aggravating factors outweighed the mitigating factors. The court commented on the brutal manner in which the murder occurred, specifically how Jackson, without provocation, repeatedly struck an innocent and helpless victim in the face with an axe. In its sentencing report the Superior Court noted:

> The defendant's activities for some time before his arrest on these charges evidence a young man out of control, with no regard for the property or health of others. Since his arrest, he has planned the death of a witness and attempted to have a former jail mate carry out the plans. Defendant's criminal history that has continued up until the commencement of this trial, greatly outweighs any hope of a chance of productivity that may be possible if defendant is incarcerated for life.

Consistent with its analysis and observations, the court sentenced Jackson to death.

■ Our careful examination of this case and those within the universe of cases which have gone to a death penalty determination since the 1991 amendment to the capital punishment statute 11 Del.C. § 4209[12], reveals that Jackson, like others sentenced to death in Delaware, committed an unprovoked, cold-blooded, murder of a person who lacked the ability to defend herself, solely for pecuniary gain. DeShields, 534 A.2d at 649. The death sentence imposed in this case was neither arbitrary nor capricious and is proportionate to the sentences imposed in like First Degree Murder cases which have resulted in the death sentence.

We therefore conclude that Jackson's sentence of death for the brutal slaying of Elizabeth Girardi was proportionate when

---

12. A listing of such cases appears as Appendix A to this opinion.

compared with the sentences imposed in Delaware's universe of cases.

The judgment of the Superior Court imposing a sentence of death is AFFIRMED. This matter is remanded to the Superior Court for further proceedings consistent with the scheduling of a new execution date pursuant to Superior Court Criminal Rule 61(*l*). This Court's order of November 6, 1995, staying the execution of Robert W. Jackson's death sentence shall terminate upon issuance of this Court's mandate. The Clerk of this Court is directed to cause a copy of this opinion to be transmitted forthwith to the attorneys for the parties and to the Commissioner of the Department of Correction.

### APPENDIX

FIRST DEGREE MURDER CASES THAT WENT TO PENALTY HEARINGS UNDER 11 *DEL.C.* § 4209 AS AMENDED IN 1991 IN 68 DEL.LAWS CH. 189

The following list of cases is a complete restatement of all first degree murder cases decided under 11 *Del.C.* § 4209 as amended in 1991 by 68 Del.Laws Ch. 189, that have gone to a penalty hearing. It incorporates and supersedes the appendices in our decisions in *Lawrie v. State*, Del.Supr., 643 A.2d 1336, 1352–56 (1994); *Ferguson v. State*, Del. Supr., 642 A.2d 772, 792 (1994); *Gattis v. State*, Del.Supr., 637 A.2d 808, 823–24 (1994); *Dawson v. State*, Del.Supr., 637 A.2d 57, 69 (1994); *Sullivan v. State*, Del.Supr., 636 A.2d 931, 953–54 (1994); *Wright v. State*, Del. Supr., 633 A.2d 329, 344 (1993); *Red Dog v. State*, Del.Supr., 616 A.2d 298, 312–15 (1992); *Pennell v. State*, Del.Supr., 604 A.2d 1368, 1378–79 (1992); *Dawson v. State*, Del.Supr., 581 A.2d 1078, 1109–11 (1990).

Cases Decided Under 11 *Del.C.* § 4209
As Amended in 1991 by 68
Del.Laws Ch. 189

Case Name: Meri–Ya C. Baker
Case No.: IN90–12–1039, 1040
County: New Castle
Sentence: Life Imprisonment

Case Name: James B. Clark, Jr.
Case No.: IN94–06–0543 through 0548
County: New Castle
Sentence: Death

Case Name: Charles M. Cohen
Case No.: IN90–02–0474 thru 0477
County: New Castle
Sentence: Life Imprisonment

Case Name: David F. Dawson
Case No.: IK86–0024; IK87–01–0841;
0843, 0845
County: New Castle (venue changed)
Sentence: Death

Case Name: Curtis Demby
Case No.: IN94–12–1518 and 1519
County: New Castle
Sentence: Life Imprisonment—Postconviction Appeal Pending

Case Name: Byron S. Dickerson
Case No.: IN90–12–1041, 1042
County: New Castle
Sentence: Life Imprisonment

Case Name: Cornelius E. Ferguson
Case No.: IN91–10–0576, 0578 thru 0581
County: New Castle
Sentence: Death

Case Name: Robert A. Gattis
Case No.: IN90–05–1017 thru 1019, 1106, 1107
County: New Castle
Sentence: Death—Postconviction Appeal Pending

Case Name: Arthur Govan
Case No.: 92–01–0166
County: New Castle
Sentence: Life Imprisonment

Case Name: Robert W. Jackson, III
Case No.: IN–92–04–1222 thru 1227;
IN92–04–1348 and 1349
County: New Castle
Sentence: Death—Automatic Appeal Pending

Case Name: David J. Lawrie
Case No.: IK92–08–0179 thru 0185;
IK92–09–0148 and 0149
County: Kent
Sentence: Death

Case Name: Frank W. Moore, Jr.
Case No.: 92–09–0001, 0002, 1001, 2001, 3001
County: Sussex
Sentence: Life Imprisonment

Case Name: Jack F. Outten
Case No.: IN92-01-1144 and 1145
County: New Castle
Sentence: Death

Case Name: James W. Perez
Case No.: IN93-02-1191 and 1197
County: New Castle
Sentence: Life Imprisonment

Case Name: James Allen Red Dog
Case No.: IN91-02-1495 to 1503
County: New Castle
Sentence: Death

Case Name: Jose Rodriguez
Case No.: IN93-020-1121
County: New Castle
Sentence: Life Imprisonment

Case Name: Reginald N. Sanders
Case No.: IK86-03-0898, 0899 and 0903
County: New Castle (venue changed)
Sentence: Life Imprisonment

Case Name: Nelson W. Shelton
Case No.: IN92-01-1154 and 1155
County: New Castle
Sentence: Death

Case Name: Steven W. Shelton
Case No.: IN92-01-1149 and 1150
County: New Castle
Sentence: Death

Case Name: Donald J. Simmons
Case No.: IN92-01-0770 thru 0772;
 IN92-01-1140 and 1141
County: New Castle
Sentence: Life Imprisonment

Case Name: Willie G. Sullivan
Case No.: IK-01-0192 thru 0196; IK92-
 02-0001; IK92-03-0022
County: Kent
Sentence: Death

Case Name: Antonio L. Taylor
Case No.: IK94-06-0047 through 0052
County: Kent
Sentence: Life Imprisonment—Appeal
 Pending

Case Name: Charles H. Trowbridge
Case No.: IK91-07-0175; IK91-09-0032
 thru 0034
County: Kent
Sentence: Life Imprisonment

Case Name: John E. Watson
Case No.: IN91-09-0020 thru 0025
County: New Castle
Sentence: Life Imprisonment

Case Name: Dwayne Weeks
Case No.: 92-01-0167
County: New Castle
Sentence: Death

Case Name: Roy R. Williamson
Case No.: S93-05-0249 thru 0255 and
 S93-05-1249 and 2249
County: Sussex
Sentence: Life Imprisonment

Case Name: Jermaine M. Wright
Case No.: IN91-04-1947 thru 1953
County: New Castle
Sentence: Death