David STEVENSON, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

Michael R. Manley, Defendant
Below, Appellant,

v.

State of Delaware, Plaintiff
Below, Appellee.

Nos. 31, 2000 and 214, 2000.

Supreme Court of Delaware.

Submitted: April 10, 2001.
Decided: May 30, 2001.

Leo John Ramunno, Esquire Wilmington, Delaware, for Appellant David Stevenson.

Joseph M. Bernstein, Esquire (argued) and Joseph A. Gabay, Esquire, Wilmington, Delaware, for Appellant Michael R. Manley.

Loren C. Meyers, Esquire, Chief of Appeals Division, Department of Justice, Wilmington, Delaware, for Appellee.

Before VEASEY, Chief Justice, WALSH, HOLLAND, BERGER, and STEELE, Justices, constituting the Court En Banc.

WALSH, Justice:

These capital murder appeals from the denial of postconviction relief in the Superior Court have been consolidated for argument and disposition. As originally filed, each appeal sought review of the Superior Court's rejection of claims of ineffective assistance of counsel. Additionally, in *Stevenson v. State*, the appellant asserted that the Superior Court trial judge should have recused himself from consideration of the postconviction relief hearing because of alleged bias or appearance of impropriety stemming from the trial judge's participation in a suppression hearing involving the victim.

During oral argument in the *Stevenson* appeal, two questions were raised by the Court, *sua sponte*, directed to the recusal claim: (a) what is the general procedure by which Superior Court judges are assigned to capital cases and (b) what procedure was used to assign the trial judge in the *Stevenson/Manley* joint trials. This Court remanded the *Stevenson* appeal to the Superior Court for submission of reports from both the President Judge and the trial judge to the questions above noted. Following the submission of these reports, the Court directed further briefing and argument, in both *Manley* and *Stevenson*, on the question of whether the procedure that led to the assignment of the trial judge in these cases was improper or created the appearance of impropriety.

On the expanded record now before us, we conclude that the trial judge's contact with the victim in this case, coupled with the judge's request for assignment of the murder cases—a request apparently made before indictment and not disclosed on the record of the proceedings in the Superior Court—created an unacceptable appearance of impropriety. In view of the trial judge's personal and independent role in the imposition of the death penalty under Delaware law, including the rendering of a victim impact assessment, the trial judge's individual actions undermined the appearance of fairness which is a prerequisite for the imposition of capital punishment. Accordingly, we are obligated to invalidate the imposition of capital punishment in both cases and remand for a new penalty hearing.

Additionally, we conclude that the appearance of impropriety precluded participation by the trial judge in the postconviction proceedings challenging the guilt phase of the joint trials. Accordingly, upon remand the appellants are entitled to re-present their postconviction claims to a different judge of the Superior Court.

I

The events leading to the present appeal are set forth in separate decisions of this Court upholding the convictions of both appellants on direct appeal. *See Stevenson v. State*, Del.Supr., 709 A.2d 619 (1998) and *Manley v. State*, Del.Supr., 709 A.2d 643 (1998). The appellants, David Stevenson and Michael R. Manley, were indicted on charges of Murder in the First Degree for the killing of Kristopher Heath on November 13, 1995. At a joint trial, the State

presented evidence sufficient to satisfy a jury that Stevenson and Manley plotted the death of Heath to prevent Heath from testifying against Stevenson who was to be tried in the Superior Court on theft charges.

The charges against Stevenson arose from his employment at Macy's where Heath worked as a security officer. The killing took place in the early morning on the date Stevenson's trial was to begin. Manley accompanied Stevenson to Heath's residence and was captured with Stevenson after fleeing the scene of the killing. At least one witness testified that a person answering Manley's description was observed running from the scene of the shooting. Neither defendant testified at trial although each presented evidence in support of an alibi defense.

After deliberation, the jury returned verdicts of guilty as to both Manley and Stevenson on all counts in the indictment: Murder in the First Degree, Conspiracy in the First Degree, Aggravated Act of Intimidation, Conspiracy in the Second Degree, and Possession of a Firearm During the Commission of a Felony. After a penalty hearing, the jury unanimously concluded, as to each defendant, that four statutory aggravating circumstances existed. As to Stevenson, the jury determined that the aggravating circumstances outweighed the mitigating circumstances by a vote of eight to four, and, as to Manley, by a vote of seven to five. In an extensive written opinion, the trial judge concluded that both defendants were deserving of the death penalty.

In his direct appeal to this Court, Stevenson argued, *inter alia*, that the trial judge should have recused himself from presiding over Stevenson's capital murder trial because he had conducted a suppression hearing in the theft case against Stevenson during which the trial judge heard the testimony of the murder victim, Heath. In rejecting that claim, this Court, applying a plain error standard of review, ruled that because the alleged disqualifying factor did not stem from an extra-judicial source, *i.e.*, the trial judge's familiarity with Heath was entirely attributable to the trial judge's participation in a related criminal case, recusal was not required under the standards announced by this Court in *Los v. Los*, Del.Supr., 595 A.2d 381, 384 (1991) and later applied in *Jackson v. State*, Del.Supr., 684 A.2d 745, 753 (1996).

In his postconviction petition in the Superior Court, filed pursuant to Superior Court Criminal Rule 61, Stevenson again raised the question of the trial judge's role in the suppression hearing in seeking recusal of the trial judge from participation in the postconviction claims of ineffective assistance of counsel. One of the grounds of ineffective assistance advanced by Stevenson was that his trial counsel "failed to file a motion for recusal of the trial court as requested by the Defendant." Specifically, Stevenson faulted his trial counsel for failing to file a recusal motion based on the appearance of partiality. To establish a factual basis for his recusal claim, Stevenson argued:

> One of the ways to establish an appearance of [ ]partiality is to attempt to determine if the trial court requested the trial or if it was assigned the case randomly. That would require an evidentiary hearing to determine the method used to assign the judge and whether the case was assigned randomly or whether there was a request or an assigned [sic] based on some other fact in the case. (Stevenson Mot. for Recusal at 3).

The trial judge denied Stevenson's motion to recuse, ruling that under both the subjective and objective tests for determining judicial disqualifications, there was

no basis for an evidentiary hearing. Inexplicably, the court noted that Stevenson's petition was "silent as to the content of the desired testimony." *State v. Stevenson*, Del.Super., No. 9511006992, at 12, 1999 WL 167779 (Jan. 8, 1999) (Mem.Op.). In a separate decision, the trial judge denied Stevenson's petition for postconviction relief without granting an evidentiary hearing. *State v. Stevenson*, Del.Super., Cr. A.No. IN95–11–1047–R1, 1999 WL 1568333 (Dec. 21, 1999). The court characterized Stevenson's arguments as "at best conclusory, if not fanciful or frivolous." *Id.* at 39. This appeal followed.

## II

### A.

As a result of this Court's order of remand to the Superior Court, two reports were filed. The first report, dated December 5, 2000, from the President Judge of the Superior Court, outlined the general standards that govern the assignment of Superior Court judges to capital cases and commented specifically on the assignment of the *Stevenson/Manley* cases to the trial judge. The report notes that all first degree murder cases, including capital cases, are individually assigned by the President Judge, "as a matter of judicial administrative discretion" and that "[i]n the event a party objects to the assignment of a judge in a particular case a motion to recuse may be filed." The report outlines the factors that guide the assignment to a particular judge, which include the "trial judge's training, experience, judicial temperament, trial time availability, caseload, special trial considerations and a judge's willingness to devote the extraordinary time and attention demanded by these cases." Assignments are made "promptly after an indictment is returned by the Grand Jury."

With respect to the specific assignment of the *Stevenson/Manley* cases, the President Judge's report recited:

4. *Assignment of* Stevenson *and* Manley *cases.* Stevenson and Manley were indicted by the Grand Jury on December 18, 1995. At the time of the assignment of these cases, [the trial judge] was assigned to Criminal Division II, had no other capital case pending trial, and requested assignments of these cases which were related to the theft proceeding over which he had presided previously. These circumstances and [the trial judge's] training, experience, judicial temperament, trial time availability, caseload, speedy trial considerations, and his willingness to devote the extraordinary time and attention demanded by these cases were the circumstances surrounding the assignment of them to him.

The trial judge, in his report, noted his prior involvement in the suppression hearing in which the victim, Heath, appeared as a witness and outlined the circumstances of the assignment to the capital cases:

**The capital murder trial.** Following the murder of Mr. Heath, I discussed the situation with President Judge Ridgely, informing him of my familiarity with the case due to having presided over the suppression hearing. I requested the assignment of the case. While I am cloudy on this, my law clerk ... specifically recalls that President Judge Ridgely told me to send him a memorandum as a reminder for him pertaining to my request for assignment.

On December 27, 1995, per his request, and following the indictment of Manley and Stevenson, I sent a memo to President Judge Ridgely asking that the case be assigned to me. On January 2, 1996, President Judge Ridgely, by mem-

orandum, assigned the case to me for all purposes until final disposition.

At the time of my request, I had no pending capital murder trials. President Judge Ridgely strives to divide murder cases equally among the judges and, quite naturally, considers volunteers in assigning high profile cases. I volunteered for two reasons. First, I had no capital cases assigned to me at the time, and second, I was familiar with the facts surrounding the Macy's theft case. I have always been impressed with the willingness of the Superior Court judges to volunteer for difficult assignments and to share in the onerous work load. I have tried to play my part.

Although not requested to respond to any claim of impropriety, the trial judge added the following conclusion to his report:

Conclusion. My familiarity with the theft case did not induce me to prejudge Stevenson and Manley on the murder charges. In fact, taking the murder case seemed to be an efficient and orderly step in the administration of justice. I had no extra-judicial knowledge of the events or parties involved in the case. I had no extra-judicial interest in the outcome. This case fell within the scope of my responsibilities as a Superior Court judge, and I approached it with the same objectivity that I have brought to all my cases during the tenure on the Court.

While it is necessary for a judge to answer for his or her actions when there is an appearance of impropriety, I find no case law or other precedent to suggest that there was any appearance of impropriety in the manner in which the Stevenson/Manley murder case was handled throughout the judicial process. On Stevenson's postconviction relief motion, I readily dispensed with his contention regarding judicial impropriety because I found it to be totally lacking in merit, if not frivolous. I reiterate that belief now.

Attached to the trial judge's report are two memoranda. The first, dated December 27, 1995, from the trial judge to President Judge Ridgely referencing the Stevenson/Manley cases, is as follows:

The defendants in the above capital murder case have now been indicted. (See attached copy of indictment.) As we discussed, I request that this case be specially assigned to me for pretrial and trial purposes. Thank you.[1]

President Judge Ridgely sent a memorandum dated January 2, 1996 to the trial judge, which recited in pertinent part: "These capital first degree murder cases are specially assigned to you for all purposes until final disposition." Copies of the President Judge's assignment memorandum were sent to the prosecutor and defense counsel for Stevenson and Manley, as well as the New Castle County Prothonotary. Neither the trial judge nor President Judge Ridgely forwarded the trial judge's December 27, 1995 memorandum to counsel or the Prothonotary.

### B.

Following receipt of the two Superior Court reports, this Court requested additional briefing from both Stevenson and Manley, with a response from the State, on the question of whether the circumstances underlying the assignment of the trial judge demonstrated prejudice to the defendants.

---

1. This memorandum does not show copies to any other individuals and apparently was not made part of the file in the Superior Court nor is it reflected on the Superior Court docket.

Both Manley and Stevenson now argue that the trial judge's actions in requesting the assignment of the murder cases after his participation in the previous suppression hearing at which the victim testified, coupled with the nondisclosure of that request, created an appearance of impropriety which, at a minimum, invalidate the trial judge's personal participation in the capital murder process under Delaware law. The State responds that the willingness of the trial judge to accept the case is a legitimate consideration in the assignment process and the trial judge's consent to that assignment would be irrelevant to a reasonable person. Moreover, the State argues, even if recusal was initially appropriate, the appellants have failed to demonstrate specific prejudice resulting from the assignment.

The standards that guide Delaware judges in dealing with the sensitive question of disqualification are generally based on the Delaware Judges Code of Judicial Conduct (the "Code"), which is modeled after the American Bar Association's Model Code of Judicial Conduct adopted in 1990. While Canon 2 of the Code admonishes generally that a judge should avoid impropriety and the appearance of impropriety in all activities, Canon 3C places upon the judge the direct responsibility to avoid participation in proceedings through the exercise of disqualification whenever "the judge's impartiality might reasonably be questioned." The Canon proceeds to list certain situations that may require the judge to exercise disqualification. *See* Canon 3C(a)-(e).

■ The specific instances prompting disqualification that are set forth in the Code do not exhaust all situations in which a judge's impartiality may be reasonably questioned. *See Los v. Los,* Del.Supr., 595 A.2d 381, 384 (1991). When a situation arises that is not covered by one of the designated instances specified in Canon 3C, a judge must engage in a two-part analysis to determine whether disqualification is appropriate. *See id.* at 384–85; *See also Jackson v. State,* Del.Supr., 684 A.2d 745, 752–53 (1996). This analysis includes a subjective and objective component. *See id.* First, the judge must be satisfied, "as a matter of subjective belief," that he or she can proceed to hear the matter free of bias or prejudice. *Id.* Second, even if the judge believes that he or she is free of bias or prejudice, the judge must objectively examine whether the circumstances require recusal because "there is an appearance of bias sufficient to cause doubt as to the judge's impartiality." *Id.* at 385. On appeal from a judge's recusal decision, the appellate court must be satisfied that the trial judge engaged in the subjective test but the appellate court "will review the merits of the objective test." [2] *Id.*

When the issue of the trial judge's participation was before this Court in Stevenson's direct appeal, it was presented under a plain error standard because there had been no request during trial that the trial judge recuse himself. This Court rejected that disqualification claim because it appeared that the trial judge's familiarity with Heath was entirely attributable to Heath's appearance as a witness during the suppression hearing in the Macy's theft case and did not stem from an extrajudicial source. *Stevenson,* 709 A.2d at 635. The present challenge to the partic-

---

**2.** To clarify any potential inconsistency arising from our decision in *Los,* we note that this Court will review a trial judge's decision under the subjective prong of the *Los* test for an abuse of discretion. A claim of appearance of impropriety, however, implicates a view of how others perceive the conduct of the trial judge, presenting this Court with a question of law to be reviewed *de novo* on appeal.

ipation of the trial judge is posed on a different and expanded record and implicates the appearance of impropriety—the objective test under *Los.* Thus, we do not view this claim as foreclosed by our previous ruling in the direct appeal.

The appearance of impropriety is conceptually distinct from the subjective approach of a judge facing a possible disqualification challenge and does not depend on the judge's belief that he or she is acting properly. *See Liteky v. United States,* 510 U.S. 540, 553 n. 2, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994) ("The judge does not have to be *subjectively* biased or prejudiced, so long as he *appears* to be so.") (emphasis in original). Indeed, in certain circumstances, the appearance of impropriety may arise where the judge is acting in utmost good faith. The Supreme Court of the United States has cast the rationale for the appearance of partiality in due process terms:

> A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness. To this end no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome. That interest cannot be defined with precision. Circumstances and relationships must be considered. This Court has said, however, that [e]very procedure which would offer a possible temptation to the average man as a judge ... not to hold the balance nice, clear, and true between the State and the accused denies the latter due process of law. Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. But to perform its high function in

the best way justice must satisfy the appearance of justice.

*In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955). (internal quotation marks and citations omitted).

More recently, the Supreme Court examined the appearance of partiality standard in construing the provisions of 28 U.S.C. § 455, the statutory standard for the disqualification of federal judges. These norms, adopted by Congress in 1974 to conform with the earlier version of Canon 3C, require disqualification of a judge "in any proceeding in which his impartiality might reasonably be questioned." In *Liljeberg v. Health Services Acquisition Corp.,* 486 U.S. 847, 859, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988), the Court noted that § 455(a) may be violated even if the judge is ignorant of the basis for disqualification, if those facts create an appearance of impropriety.

■ When a judge knows, or as soon as a judge discovers, facts that would lead a reasonable person to question his or her impartiality in a particular matter, it is essential that he or she promptly disclose that information. Following the prompt disclosure of such information, a judge should engage in the two-part inquiry under *Los.* In addition, prompt disclosure of such information permits the timely filing of a motion for recusal, which would require the trial judge to engage in the objective analysis of the appearance of impropriety mandated by *Los.* In *Liljeberg,* the Supreme Court found it "remarkable—and quite inexcusable" that the trial judge failed to recuse himself after learning of the basis for disqualification. Moreover, the Court noted that the judge's failure to disclose this information deprived the affected party of the timely opportunity to file a recusal motion before judgment. *Liljeberg,* 486 U.S. at 866, 108 S.Ct. 2194.

The record before us demonstrates that the trial judge: (a) became aware of the killing of Heath by Stevenson and Manley before the defendants were indicted; (b) discussed an assignment of the murder trial to himself with the President Judge prior to the indictment; and, (c) did not place on the trial record the substance of his discussion with the President Judge or file the December 27, 1995 memorandum with the Prothonotary. It also appears that the President Judge's assignment memorandum of January 2, 1996 does not indicate that it was in response to the trial judge's written request for assignment nor does it mention the earlier, pre-indictment discussion with the trial judge. Although this memorandum was filed with the Prothonotary and copies were sent to trial counsel, it is incomplete, not reflective of prior communications between the trial judge and the President Judge, and not sufficient to place trial counsel on notice of the request for assignment.

In his report to this Court, the President Judge indicates that the trial judge was assigned to these cases because of his "training, experience, judicial temperament, trial time availability, caseload, speedy trial considerations, and his willingness to devote the extraordinary time and attention demanded by these cases." While these are pertinent considerations in the case assignment process, they do not supersede the demands of the appearance of impropriety mandated by the Code of Judicial Conduct. *See* Canon 3C. The willingness of a judge to accept an assignment carries no implication of impropriety, but a

trial judge's initiation of the request for assignment may raise questions concerning motivation. Under the unusual circumstances now revealed, we are forced to conclude that the trial judge should not have requested the murder case assignment prior to indictment in view of his prior contact with the victim in the suppression hearing. The trial judge's conduct raises a serious question concerning whether his continued participation created the appearance of partiality, particularly if the disclosure of the trial judge's December 27, 1995 memorandum likely would have prompted a recusal motion.[3]

Furthermore, the importance of the timely disclosure of any potential basis for disqualification is illustrated by this case. Stevenson and Manley did not file recusal motions at trial because neither party knew of the circumstances surrounding the trial judge's assignment to this case. Presumably, the trial judge did not disclose this information because he did not believe that it created the appearance of impropriety.[4] Whenever there are facts or circumstances, however, that have the potential to create the appearance of impropriety or partiality, a judge must disclose those facts promptly to permit the party to file a recusal motion. Had the trial judge's memorandum to President Judge Ridgely been disclosed to the parties prior to trial, a timely recusal motion could have been filed by defense counsel. Indeed, the failure to file such a motion later became one of the claims of ineffective assistance of counsel asserted against

3. The record before us does not support a finding of actual impropriety and we need not decide whether there was actual bias or bad faith in the assignment request or the assignment process. Our holding rests on the appearance of impropriety, which tends to undermine public trust and confidence in the judicial process. Where the appearance of impropriety is present, any inquiry into actual bias is irrelevant.

4. This conclusion is reinforced by the fact that the trial judge did not disclose this information in connection with his ruling on Stevenson's postconviction motion for recusal.

Stevenson's trial attorney in the postconviction proceedings.

Moreover, had there been appropriate and timely disclosure of the request for assignment, a recusal motion based on the appearance of impropriety would have required the trial judge to engage in the objective test under *Los* and, more importantly, would have established a different basis for review of the recusal claim in Stevenson's direct appeal. That information did not surface, however, until after the defendants' convictions and death sentences had been affirmed on direct appeal.

### III

The State argues that even if recusal was the appropriate outcome, neither defendant is entitled to a new trial or penalty hearing unless they can articulate specific prejudice attributable to the participation of the trial judge. But inquiry into the effect of participation by a judge under the appearance of partiality prong is not limited to a search for discrete rulings demonstrating prejudice. The test is whether, in the words of the Canon 3C, the judge's impartiality "might reasonably be questioned." In rejecting a similar contention by the government concerning post-trial comments made by a sentencing judge, the Third Circuit Court of Appeals noted: "But in determining whether a judge had the duty to disqualify him or herself, our focus must be on the reaction of the reasonable observer. If there is an appearance of partiality, that ends the matter." *United States v. Antar,* 3d Cir., 53 F.3d 568, 576 (1995). As the Court noted in *Liljeberg,* in considering whether a judgment should be vacated for a violation of the appearance of partiality standard "it is appropriate to consider the risk of injustice to the parties in the particular case, the risk that the denial of relief will produce injustice in other cases, and the risk

of undermining the public's confidence in the judicial process." 486 U.S. at 864, 108 S.Ct. 2194.

It is noteworthy that the Supreme Court uses the term "risk" in evaluating the effects of appearance of impropriety violations. It is, of course, difficult to quantify the extent to which the appearance factor results in injustice in a particular case where the judge appears to have acted in an even-handed fashion and, where, as here, the trial results have been subject to a searching review on appeal. But we are not required to find that the trial judge was influenced by bias, only that his conduct created the unacceptable risk that a reasonable observer would so conclude.

▮▮▮▮ Any inquiry into the question of whether a judge's impartiality might reasonably be questioned is case specific. Where the claim of appearance of impropriety is based on the risk that the judge has evidenced a personal interest in the outcome of the case, the extent of the judge's personal involvement in the outcome of the proceedings is an important factor. The risk that injustice might result from a judge's participation in a proceeding despite the appearance of partiality is particularly acute in a capital murder prosecution where the ultimate fixing of the sentence is in the hands of the trial judge.

Under Delaware's capital punishment procedures, the trial judge occupies a unique role in the sentencing calculus. While the jury alone determines guilt, the imposition of the sentence is a shared responsibility with the judge exercising ultimate responsibility. *See* 11 *Del. C.* § 4209(c) & (d). While the jury is required to find beyond a reasonable doubt the existence of at least one aggravating circumstance and determine by a preponderance of the evidence whether the aggravating circumstances outweigh the miti-

gating circumstances, its "affirmative and negative votes on each question" are merely recommendations. *Id.* § 4209(c)(3). The sentencing judge must engage in the same exercise but is not bound by the jury's recommendation. *See id.* § 4209(d).

As to *Manley*, the jury concluded, by a vote of seven to five, that the aggravating circumstances outweighed the mitigating circumstances. The jury reached the same result as to *Stevenson* by a vote of eight to four. In a lengthy written decision, the trial judge made his findings and determined that "the calculated and cowardly execution of a State's witness constitutes a case calling for [the death penalty]" *State v. Manley,* Del.Super., No. 951107022, at 43, 1997 WL 27094 (Jan. 10, 1997) (Findings After Penalty Hearing). He referred to the killing of Heath as "nothing less than a witness elimination murder." *Id.*

The trial judge elaborated at length on the circumstances that led to Heath's murder. The judge referred to Heath as "a young man, equally talented and possessing the same ambitions for life which [the defendants] held" but commented that Heath "was expendable" because he was the security officer who had participated in the investigation that led to Stevenson's arrest. *Id.* at 41. Later, the trial judge stated:

> This Court cannot recall a more chilling and premeditated, execution-style murder than was conclusively proven in this case. A security officer was preparing to go to court to seek redress on behalf of his employer. That this route was short-circuited by his elimination constitutes an attack upon the very foundation of our judicial branch of government. Utter contempt and disdain for the judicial process were evidenced by Manley's and Stevenson's premeditated and outrageously cold blooded assassination of a wholly innocent witness to a crime.

*Id.* at 42.

It is obvious that the trial judge harbored strong feelings about the murder of Heath whom he had observed as a witness in the suppression hearing. Of more concern, however, is that the trial judge apparently viewed the murder of Heath as an attack on the judicial process—the very process in which the trial judge had personally participated as the judge handling the suppression hearing. While the trial judge's repulsion at the killing of an innocent witness is understandable, his sentencing findings carry a tone of personal affront. In the context of a capital punishment case, this is troubling, particularly when viewed in light of the trial judge's personal request for assignment of the *Manley–Stevenson* murder cases even before the defendants were indicted.

■ As this Court recently commented in *Barrow v. State,* Del.Supr., 749 A.2d 1230, 1249 (2000), "The imposition of the death penalty requires scrupulous adherence to the constitutional standards that authorize its use." Our review of capital punishment cases has been marked by a close scrutiny to insure that the process is not only fair but appears fair. This heightened scrutiny springs from the recognition that capital punishment is "unique in its severity and irrevocability." *Gregg v. Georgia,* 428 U.S. 153, 187, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).

In the capital punishment calculus under Delaware law, the judge, more than the jury, acts on the conscience of the community. In this case the exercise of the decision to impose capital punishment is subject to serious question given the trial judge's intervention in the assignment process.

■ The Court is aware that there is extended debate at the national and local level concerning whether the death penalty is fairly imposed and that there are calls for a moratorium on its use. While the adoption of the death penalty as an appropriate form of punishment is a legislative prerogative, the judiciary has a special obligation to ensure that the standards governing its application are applied fairly and dispassionately and, just as important, appear to be so. Indeed, this Court is required by statute to automatically review the imposition of death sentences to ensure they are not arbitrarily imposed or that due process was not lacking, even where the defendant sentenced to death has not appealed. *See* 11 *Del. C.* § 4209(g).

The trial judge's participation in the sentencing process is not subject to a harmless error analysis, since, given the closeness of the jury vote, we cannot say with confidence that another Superior Court judge would impose the death penalty after considering the jury's recommendation.[5] In short, the appearance of partiality evident in this case creates too great a risk that a constitutional violation has occurred in the imposition of the death penalty.[6]

■ Although the impetus for examining the assignment process of the trial judge was Stevenson's postconviction claim that the trial judge should have recused himself from ruling upon Stevenson's postconviction relief petition under Super. Ct. Crim. R. 61, any remedy to correct the problem, must extend to Manley, as well. The defendants were indicted, tried and sentenced jointly and any taint of partiality extends to both. Therefore, we conclude that granting a new penalty hearing as to each defendant is necessary to ensure that the defendants were not deprived of due process in the sentencing phase and to advance public confidence in the administration of justice.

We recognize that the remedy directed in this matter, a new penalty hearing, is not the result of evidentiary rulings or errors that occurred during the penalty hearing and that may have affected the jury's recommendation. *Compare Barrow,* 749 A.2d at 1249. The capital sentencing procedure mandated by 11 *Del. C.* § 4209 is a unitary process, however, involving a "hearing conducted by the trial judge before a jury," § 4209(b)(2), with the judge imposing sentence "after considering the recommendation of the jury," § 4209(d). Thus, to correct any appearance of impropriety that occurred through the personal

---

5. Reports of sentencing judges in capital murder cases filed in this Court reflect instances where judges have imposed life imprisonment following jury recommendations of the death penalty with votes approximating those returned in these cases. *See Cabrera v. State,* Del.Supr., 747 A.2d 543 (2000) (Per Curiam)(vote of 7 to 5); *Govan v. State,* Del. Supr., No. 363, 1993, 655 A.2d 307, Walsh, J. (1995) (ORDER) (vote of 7 to 5, 6 to 6, 8 to 4 and 8 to 4 on separate counts of first degree murder); *Rodriguez v. State,* Del.Supr., No. 466, 1993, 659 A.2d 228, Walsh, J. (Nov. 29, 1994) (ORDER) (vote of 9 to 3); *Baker v. State,* Del.Supr., No. 360, 1992, 637 A.2d 825, Holland, J. (Dec. 30, 1993) (ORDER) (vote of 9 to 3); *Dickerson v. State,* Del.Supr., No. 353,

1992, 637 A.2d 826, Veasey, C.J. (Dec. 21, 1993) (ORDER) (vote of 9 to 3); *State v. Jones,* Del.Supr., No. 293, 2000 (Pending) (vote of 7 to 5).

6. "The Due Process Clause 'may sometimes bar trial judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. But to perform its high function in the best way, justice must satisfy the appearance of justice.'" *Aetna Life Ins. Co. v. Lavoie,* 475 U.S. 813, 825, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986) (quoting *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955)).

participation of the trial judge in the sentencing process, we have no alternative but to order a new penalty hearing to be conducted by a different judge who, in turn, will be required to consider, anew, the recommendation of a jury.

■ Our direction for a new penalty hearing does not necessarily end the matter because there remain the Rule 61 postconviction relief petitions of both Stevenson and Manley, the rejection of which by the trial judge prompted this appeal.[7] Each of those petitions contains claims directed to the guilt phase of the trial, including claims of ineffective assistance of counsel. Moreover, on both appeals to this Court, the defendants complain of the trial judge's refusal to grant them an evidentiary hearing on their postconviction claims. Our present ruling is limited to the recusal issue and its effect on the penalty hearing and we do not consider the merits of any claims directed to the guilt phase. Because we have concluded that the trial judge's role in the sentencing process created the appearance of impropriety, the judge's participation beyond that point cannot be condoned. The merits of claims directed to the guilt phase must be considered by a new judge, *ab initio*, with leave granted to the defendants to amend their petition, if necessary in the light of the present ruling.

While a new penalty hearing is required in any event, the successor judge should first consider the reasserted postconviction petitions in order to determine whether relief involving the guilt phase is also required. We express no opinion on that matter and we emphasize that our ruling that the trial judge should not have participated in the sentencing process does not suggest that the trial judge's participation in the guilt phase resulted in any specific prejudice to the defendants. The appellants have not identified any instance of such prejudice and our decision in the direct appeal found no error with respect to the claims there asserted.

The decision of the Superior Court denying postconviction relief is REVERSED and these appeals are REMANDED to the Superior Court for further proceedings consistent with this opinion.

---

7.  As was previously noted, it was Stevenson's petition for postconviction relief that sought recusal of the trial judge from participation in the Rule 61 proceedings.