Sadiki **GARDEN**, Defendant Below, Appellant,

v.

**STATE of Delaware, Plaintiff Below, Appellee.**

No. 125, 2001, 162, 2001.

Supreme Court of Delaware.

Submitted: Nov. 4, 2002.

Decided: Jan. 24, 2003.

Bernard J. O'Donnell (argued), Brian J. Bartley, Timothy J. Weiler, and Nicole M. Walker, Assistant Public Defenders, Office of the Public Defender, Wilmington, for Appellant.

Loren C. Meyers, Chief of Appeals Division, Timothy J. Donovan, Jr. (argued), Thomas E. Brown, Elizabeth R. McFarlan, and Caroline Lee Cross, Deputy Attorneys General, Department of Justice, Wilmington, for Appellee.

Before VEASEY, Chief Justice, WALSH, HOLLAND, BERGER, and STEELE, Justices, constituting the Court En Banc.

WALSH, Justice:

This is a direct appeal from the Superior Court's imposition of a sentence of death upon the appellant, Sadiki Garden ("Garden"). Garden challenges his convictions on various procedural and evidentiary grounds but also asserts that the trial judge erred in overriding the jury's recommendation in the weighing phase of the punishment determination. While we find no error in the guilt phase, we conclude that the trial judge erred in his consideration of the weight to be given to a jury's determination that the aggravating factors did not outweigh the mitigating circumstances. Accordingly, we affirm Garden's convictions but reverse the imposition of the death penalty and remand this matter to the Superior Court to permit the trial judge to apply the appropriate standard for override of a jury's recommendation in a capital case.

I

Garden was indicted for a series of offenses arising from the December 17, 1999 robbery of Vince Marge and Karen Hama as well as the December 18, 1999 attempted robbery of John Weilbacher, Stephanie Krueck, and Denise Rhudy. The latter incident resulted in the murder of Denise Rhudy. These crimes, committed on successive days and following the same pattern, occurred in a parking lot behind the Bottlecaps restaurant located on Eighth Street in Wilmington, approximately a block away from Garden's apartment.

Three individuals were implicated in all of these crimes, Garden and two codefendants, Christopher Johnson ("Johnson") and James Hollis ("Hollis"). Both Hollis and Johnson entered into plea agreements with the State and testified against Garden at trial. Garden's defense below was identity. He challenged the credibility of Hollis and Johnson as well as the reliability of the eyewitnesses who testified that Garden was the one who shot Denise Rhudy. Garden maintained that the only crimes he was guilty of involved use of credit cards stolen during the December 17 robbery.

The evidence at trial proved the following sequence of events. On the night of December 17, Garden picked up Hollis and Johnson in a minivan and the trio drove around, eventually returning to Garden's apartment. Garden and Johnson, who was armed with a handgun, then decided to go looking for someone to rob. Hollis, an amputee who walks with crutches, remained in the apartment. Garden and Johnson walked around the area searching for victims. They came upon Vincent

Marge and Karen Hama in a parking lot at Eighth and Orange Streets. Johnson, the gunman, demanded money from Marge and Hama while Garden stood watch. After taking Marge's wallet and Hama's purse the pair ran back to Garden's apartment. Garden, Johnson, and Hollis then went shopping using the stolen credit cards, first stopping at a gas station, then going to Walmart.

The next night, December 18, Garden again picked up Hollis and Johnson, and the three spent the evening driving around, drinking and smoking marijuana. Eventually, they decided to try their hand at robbery again, and they returned to the same area near Garden's apartment. This time, Hollis stayed in the car while Johnson and Garden, who was now carrying the gun, went looking for potential robbery victims. Johnson and Garden came upon Weilbacher, Krueck and Denise Rhudy who had just parked in the lot at Eighth Street and were about to go to Bottlecaps.

As Krueck and Weilbacher were getting out of the vehicle, Garden approached them, pointed the gun, and demanded money. Johnson hung back, acting as a lookout. Both Weilbacher and Krueck responded that they did not have any money. Garden then leaned in the front of the car, on the passenger side, and confronted Denise Rhudy, who was still sitting on the driver's seat. When Rhudy, too, refused to give Garden any money, he shot her twice. One bullet struck her in the chest and the other in the neck. Either shot would have been fatal and Denise Rhudy died at the scene.

Johnson ran off as soon as he heard the gunshots. Garden, too, started to run away but then stopped, turned, and fired one shot at Krueck before running to join Johnson and Hollis. The bullet went through Krueck's jacket, but did not hit her. The three men then drove to a party.

Police apprehended Hollis, Johnson, and Garden three days later. At trial, Garden was acquitted of the attempted murder of Stephanie Krueck, but convicted of all other charges stemming from the events of December 17 and 18.

At Garden's trial, Krueck and Weilbacher testified that Garden was the individual who shot Denise Rhudy. Both testified to a high degree of confidence in their identification of Garden as the shooter. To attack these identifications, Garden submitted expert testimony on the unreliability of eyewitness identification, particularly cross-racial identification, as occurred here. The trial court admitted the bulk of the expert's testimony, but refused to allow him to testify that the degree of confidence an eyewitness espouses has no relationship to its accuracy. The trial court also refused to instruct the jury that they could consider the cross-racial nature of an eyewitness identification in evaluating the accuracy of that evaluation.

In addition to various robbery and weapon charges, Garden was convicted of one count of intentional murder and one count of felony murder arising out of the robbery charge. Following the guilty verdicts, a penalty hearing was conducted. The jury was instructed, as required by 11 *Del. C.* § 4209(e)(2), that a statutory aggravating factor had been established by its verdict that the murder was committed during an attempted Robbery First Degree. The jury was instructed to weigh all aggravating factors against mitigating circumstances and recommend for or against the death penalty. As instructed, the jury determined unanimously, and beyond a reasonable doubt, that the State had established a statutory aggravating factor. The jury also found, by a vote of 10 to 2 that, as to the Intentional Murder count, the "aggravating circumstances did not outweigh the mitigating circumstances." As

to the Felony Murder charge, the jury reached the same result with a vote of 9 to 3.

After conducting his own analysis of the circumstances of the offenses and the defendant's character, the trial judge declined to follow the jury's recommendation and imposed the death penalty. This appeal followed.

## II

■ Garden contends the charges stemming from the December 17 robbery and credit card use should have been severed from the charges stemming from the December 18 crimes. Garden argues that the decision to try these charges together caused him substantial prejudice because it affected his decision not to testify in his own behalf. Garden claims that he would have testified in his own behalf as to the murder charge, but for the fear that the State would then introduce the fact that he initially lied to police regarding the events of December 17, but later confessed. The trial court denied Garden's pretrial motion to sever, finding that the events of December 17 and 18 were part of the same robbery scheme and that evidence of the December 17 crimes would be admissible in his trial for the December 18 murder and vice versa, so no prejudice resulted. *State v. Garden*, 2000 WL 33114325 (Del.Super.Nov.1, 2000). The State asserts that the trial court did not abuse its discretion in denying Garden's motion to sever. We review the trial court's denial of a motion to sever under an abuse of discretion standard. *Caldwell v. State*, 780 A.2d 1037, 1055 (Del.2001).

■ Under Super. Ct. Crim. R. 8(a), two or more offenses may be joined in the same indictment provided that one of the following circumstances exists: the offenses are of the same or similar character; the offenses are based on the same act or transaction; the offenses are based on two or more connected acts or transactions; or the offenses are based on two or more acts or transactions constituting parts of a common scheme or plan. The rule of joinder "is designed to promote judicial economy and efficiency, provided that the realization of those objectives is consistent with the rights of the accused." *Mayer v. State*, 320 A.2d 713, 717 (Del. 1974). If it appears that the defendant is prejudiced by a joinder of offenses in an indictment, however, the Superior Court may sever the offenses and order separate trials even though the offenses were properly joined in the same indictment. Super. Ct. Crim. R. 14; *State v. McKay*, 382 A.2d 260, 262–63 (Del.Super.1978).

■ After denial of a motion to sever, a new trial is warranted only if the defendant can show that there is a reasonable probability that a joint trial caused substantial prejudice to his defense. *Caldwell*, 780 A.2d at 1055. As a general matter, prejudice in this context arises where: (1) the jury may cumulate the evidence of the various crimes charged and find guilt when, if considered separately, it would not so find; (2) the jury may use the evidence of one of the crimes to infer a general criminal disposition of the defendant in order to find guilt of the other crime or crimes; and (3) the defendant may be subject to embarrassment or confusion in presenting different and separate defenses to different charges. *Id.*

■ In determining whether the trial court abused its discretion, it is necessary to examine the facts in each case. *Younger v. State*, 496 A.2d 546, 550 (Del.1985). The defendant has the burden of demonstrating substantial prejudice, and mere hypothetical prejudice will not suffice. *Skinner v. State*, 575 A.2d 1108, 1118 (Del. 1990). Further, "a crucial factor to be

considered" is whether the evidence of one crime would be admissible in the trial of the other crime, because if it were admissible, there would be no prejudicial effect in having a joint trial. *Wiest v. State,* 542 A.2d 1193, 1195 n. 3 (Del.1988), *citing Bates v. State,* 386 A.2d 1139, 1142 (Del. 1978). Generally, evidence of one crime is admissible in the trial of another crime when it has "independent logical relevance" and its probative value outweighs prejudice to the defendant. *Getz v. State,* 538 A.2d 726, 730 (Del.1988); D.R.E. 404(b).

Garden asserts that, had there been two trials, he would have conducted his defense differently, *i.e.,* that he would have testified at one trial conceding his use of the credit cards but denying involvement in the robberies. This claim does not support a claim of abuse of discretion when weighed against the factors that support joinder. The short period of time that elapsed between the December 17 robbery and the December 18 murder, as well as the similar *modus operandi,* makes it clear that the offenses involve the same course of conduct within a relatively brief span of time. *See Skinner,* 575 A.2d at 1118, *citing Brown v. State,* 310 A.2d 870, 871 (Del.1973). The mere fact that the crimes were "separate," and were committed against different individuals with a lapse of time between them, does not require severance. *Id., citing McDonald v. State,* 307 A.2d 796, 798 (Del.1973).

The evidence established that on both December 17 and December 18, Garden and Johnson set out, armed, looking for people to rob. On the first night, Johnson carried the weapon and the pair were successful in obtaining money from their victims. On the second night, no doubt hoping to capitalize on the previous night's success, the pair went back to the same area to look for victims. The events of these two nights were obviously part of a common plan, the only—but crucial—difference being that the second night's robbery resulted in the death of Denise Rhudy.

Furthermore, the December 17 robbery charges are of independent logical relevance and would have been admissible in a separate murder trial. The evidence established that the stolen credit cards and the resulting shopping spree is what led police to the arrest of Garden and Johnson for the murder on December 18. The charges are not so voluminous as to confuse the jury or prevent consideration of each charge on its merits. Indeed, the jury apparently was able to evaluate each charge because it acquitted Garden on the charge of attempted murder of Krueck. Garden's claim that he would have testified in a separate murder trial is hypothetical and somewhat disingenuous. Garden contends that he was concerned about admission of his statement to police regarding the events of December 17—but Garden's inconsistent statements could have been used to impeach his credibility in a separate murder trial as well. He initially told police he was not involved at all, then admitted that he took part in the shopping spree using the stolen credit cards. This falsehood would certainly be relevant evidence bearing on his credibility as a witness.

III

Garden asserts that he was denied a fair trial because his attorney did not have access to the criminal histories of the jury panel at the same time as the State. Although Garden claims this is a question of law, requiring *de novo* review, the standard and scope of review applicable to this issue is abuse of discretion. *Watson v. State,* 719 A.2d 948 (Del.1998), 1998 WL 780343.

At the beginning of jury selection, each side was provided a list of potential jurors, and the State compiled criminal histories for everyone on the list, using the DELJIS (Delaware Justice Information System) system. At the request of the defense, the trial court ordered the State to provide defense counsel with a copy of the criminal history of each juror after *voir dire* but before the exercise of challenges. At the time the court made this ruling, seven potential jurors had already been subject to *voir dire*. Three jurors were seated, one juror was excused for cause, one juror was peremptorily challenged by the State, and two jurors were peremptorily challenged by Garden. Garden now argues that he was denied a fair trial because his attorney did not have the criminal histories of these seven jurors/potential jurors and because the State had time to "study" the histories whereas the defense did not see them until immediately before it had to decide whether to challenge. The State argues that Garden was not entitled to equal access to the DELJIS records even though it acceded to the trial court's request to supply such information to the defense. In any event, the State contends the defendant suffered no prejudice.

In *McBride v. State*, 477 A.2d 174 (Del. 1984), this Court held that the defendant's due process rights were not violated by the trial court's refusal to compel production of the State's jury cards, because the defendant had other means of acquiring the requested information by recourse to the juror's Juror Qualification Form responses, and to public records. *Id.; see also Watson v. State*, 1998 WL 780343 (Del. 1998) (holding there is no duty upon the State to furnish criminal arrest and conviction records of the jury pool members to the defense). All members of the jury array are required to complete a "Juror Qualification Form." 10 *Del. C.* § 4508.

In *McBride*, the State used "jury cards," which supplemented the Juror Qualification Form information with background data on the nature of a juror's prior jury service, including information as to length of jury deliberation and verdicts rendered. *Id.* The State's juror cards also included a description of the criminal record of any member of the array. *Id.* As a consequence, McBride argued that the State obtained an "unfair advantage" in the jury selection process, deprived her of more effective use of her peremptory challenges and thereby denied her the right to a fair trial. *McBride*, 477 A.2d at 190. Because "[t]here is no general constitutional right to discovery in a criminal case," this Court held that there was no denial of due process in the trial court's refusal to compel production of the State's jury cards. *Id., citing Weatherford v. Bursey*, 429 U.S. 545, 559, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977).

The right to challenge prospective jurors, either peremptorily or for cause, is one of the primary safeguards available to secure an impartial jury. *Jackson v. State*, 374 A.2d 1, 2 (Del.1977); *Robertson v. State*, 630 A.2d 1084, 1092 (Del.1993) (criticizing and disapproving the practice of permitting counsel to know in advance the order of individual *voir dire* because it creates "the potential for compromising the random selection of jurors."). Due process is violated, however, "only when the prosecution fails to disclose information bearing on a juror's ability to render an impartial verdict." *McBride*, 477 A.2d at 190, *citing Smith v. Phillips*, 455 U.S. 209, 221–22, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

In this case, the State used the criminal histories only as a supplement to the Juror Qualification Form. For example, if a juror indicated on his Form that he had not been convicted of a crime, but the State's

DELJIS records showed otherwise, the State could impeach the potential juror. Members of the jury array who had not been convicted of a crime were not affected by this information. Furthermore, Garden was provided with the criminal histories once his objection was lodged and considered by the trial court. The fact that the State had the information for a longer period of time is of no consequence, since the criminal history is not a complex document requiring study. Defense counsel was able to tell at a glance whether or not the information provided by the potential juror with respect to his criminal record was accurate.

 Finally, the State's argument that the trial judge should not have provided the defense with the jurors' criminal histories out of privacy concerns need not be considered by this Court. The trial judge attempted, as a matter of fairness, to balance the information available to both parties. We find no abuse of discretion in his requiring the State to share its information on potential jurors with the defense.

### IV

 We next address Garden's claim that the Superior Court erred in admitting into evidence a letter from Johnson addressed to Garden and found in Garden's apartment when the police executed a search warrant. The letter, written two years prior to the robberies, was offered by the State to show a friendly and longstanding relationship between the two individuals in an apparent attempt to rebut the suggestion in defense counsel's opening statement that Johnson and Hollis were friends who were falsely accusing Garden. When the State sought to introduce the letter through the testimony of Detective Mullins, a police officer who conducted the search of Garden's apartment, the defense objected on grounds of lack of authentication, relevance and that the letter was outside the scope of the search warrant. We review the trial judge's ruling admitting the evidence under an abuse of discretion standard.

Delaware Rule of Evidence 901(a) provides that evidence must be presented establishing that the "matter in question is what its proponent claims." D.R.E. 901(a). Although Detective Mullins could not authenticate the letter through handwriting familiarity or personal knowledge, the letter, to a limited extent, was self-authenticating in that it contained Johnson's return address (the Delaware Correctional Center) and Garden's address. Whatever weakness of authentication existed could have been clarified by defense counsel during cross-examination of Johnson, but the subject was not broached. Given these circumstances, the admission of the letter was, at most, harmless beyond a reasonable doubt.

With respect to the relevancy objection, the letter was offered to prove that Johnson and Garden were acquainted, a matter about which Johnson testified extensively at trial. Thus, while relevant, the letter added little to the evidence of relationship otherwise established at trial. Nor do we find merit to the claim that the letter was seized outside the authority conferred by the search warrant. The warrant in question authorized the seizure of "property, articles, *papers*, or things" on the property occupied by Garden. The letter was found on the kitchen table in plain view and bore Garden's name on the envelope.

Finally, we do not find the letter and evidence subject to objection on grounds of hearsay. As noted, the purpose of the offer was to establish a relationship already established through direct testimony, not the contents of that letter. The Superior Court did not abuse its discretion in admitting the letter into evidence after

weighing the probative value of the evidence against prejudice to the defendant. D.R.E. 403(b).

## V

At Garden's trial, Weilbacher identified Garden as the individual who shot Denise Rhudy. Although Weilbacher gave police a description of the shooter immediately after the incident, he could not pick the shooter out of a photo lineup that night, the following day, or three days later. On January 7, 2000, Weilbacher attended the preliminary hearing for Garden and his two codefendants. After seeing Garden, Weilbacher informed the investigating officer that he could now identify Garden as the shooter. Weilbacher testified at trial that seeing Garden at the preliminary hearing "brought it all back, that I thought that was the guy." Garden challenged Weilbacher's in-court identification based on his previous difficulty in making an identification and sought a mistrial. The court denied this motion ruling that Weilbacher's observation of Garden at the preliminary hearing was not unduly suggestive. The court also noted that Weilbacher was at the hearing, not upon subpoena by the State, but voluntarily on his own right as a victim.

The State argues that Weilbacher's in person identification occurred only three weeks after the crime. The State contends that under *Laury v. State*, 260 A.2d 907, 909 (Del.1969) a victim's pretrial identification of a defendant does not violate the defendant's rights in the absence of State misconduct. The State argues that there was no such misconduct, because defense counsel were aware of Weilbacher's presence among the victim's friends and family at the preliminary hearing which Weilbacher attended voluntarily.

An identification procedure will not pass constitutional muster if it is "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Younger v. State*, 496 A.2d 546, 550 (Del.1985), *quoting Simmons v. United States*, 390 U.S. 377, 394, 388, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). Even if the Court determines under the totality of circumstances that a line-up is impermissibly suggestive, but nonetheless reliable, evidence of the confrontation will not be excluded at trial. *Id.* The reliability need not be addressed unless the defendant first establishes the procedure was impermissibly suggestive. *Id.* In *Laury v. State*, there was a confrontation of the defendants by the victim at a preliminary hearing eleven days after the crime. 260 A.2d at 909. This Court rejected Laury's argument that the identification at the preliminary hearing acted as a pernicious "show-up," reasoning that Laury's argument would require a "line-up" identification prior to every preliminary hearing. *Id.*

Garden's rights were not violated by the identification at the preliminary hearing. The dispute as to whether defense counsel were aware of Weilbacher's presence at the hearing cannot be resolved based on the record before us. The fact remains, however, that Weilbacher was a victim whose presence at the hearing was not solicited by the State. Although the evidence discussed at the hearing was certainly suggestive, the hearing took place only two weeks after the crime and was Weilbacher's first opportunity to see Garden in person. Under the totality of these circumstances, there is no substantial likelihood of irreparable misidentification.

## VI

At trial, the State presented considerable evidence establishing Garden's participation in the December 18

robbery attempt that led to Denise Rhudy's death. Besides Garden's original co-defendants—Johnson and Hollis—two of the victims confronted by Garden—Weilbacher and Krueck—were emphatic in their identification of Garden as the individual who shot Denise Rhudy. In an obvious attempt to counter that testimony, the defense retained Dr. Solomon Fulero, a psychologist who has studied and written on the limitations of eyewitness testimony. The trial judge conducted an extensive *Daubert*[1] type hearing following which he ruled that Dr. Fulero could testify as an expert in the field of eyewitness identification with one limitation: the expert could not opine on the confidence/accuracy component of eyewitness testimony because such opinion would amount to a comment on the veracity of the witnesses who testified and thus would invade the province of the jury.[2] On appeal, Garden claims that this restriction was erroneous.

The decision by a trial court to exclude expert testimony is reviewed for an abuse of discretion. *M.G. Bancorporation, Inc. v. Le Beau*, 737 A.2d 513, 522 (Del.1999). This deferential standard of review is simply a recognition that trial judges perform an important gatekeeping function and thus "must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

Expert testimony must be both relevant and reliable in order to be admissible. *M.G. Bancorporation*, 737 A.2d at 521 (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). The relevance of the testimony relates to its value in assisting the jury. *Id.* Through the use of jury instructions, the trial court can limit the inferences that the jury may fairly draw from the evidence. *Davis v. Maute*, 770 A.2d 36, 41 (Del.2001).

The trial judge permitted Dr. Fulero to testify concerning certain factors that may affect eyewitness testimony such as stress levels, weapons focus and memory reconstruction because the court was apparently persuaded that the evidence was reliable, *i.e.,* supported by empirical evidence and

---

1. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

2. Dr. Fulero's opinion on the significance of the confidence/accuracy relationship is illustrated in the following exchange with the trial judge:

> THE COURT: Your testimony seems to convey that there is a decrease in accuracy when a witness says that he or she is confident of an identification.
> THE WITNESS: Let me clarify that.
> THE COURT: I have a hard time accepting it.
> THE WITNESS: I understand that. That's really not what I'm saying. What I'm saying is that the correlation between the two is really low, meaning you can't use one to predict the other.

See, the corollary is that a non-confident witness can also be accurate. In other words, it just doesn't help you any.

> THE COURT: If somebody says, "I'm 90 percent sure," that could be quite an accurate identification.
> THE WITNESS: It could, but it's not in and of itself, because the witness is confident, a signal of accuracy. When there's no correlation, you can't use one to predict the other.

Again, this is an important law enforcement issue because non-confident witnesses are often just excluded because they're no good. But in point of fact, the non-confident witness is almost as likely to be right as the confident one and shouldn't be excluded as an investigative tool just because the witness isn't confident, because they too can be right just as confident witnesses can be wrong.

relevant. Because the expertise of this witness was clearly established, there appeared to be a sufficient basis to admit Dr. Fulero's testimony concerning the confidence/accuracy issue. Such evidence is normally admitted if supported by sufficient authority. As the Third Circuit has explained:

> [E]xplication of the confidence/accuracy studies could prove helpful to the jury in assessing the reliability of . . . identifications. That witnesses ofttimes profess considerable confidence in erroneous identifications is fairly counterintuitive. [*United States v. Downing*, 753 F.2d 1224, 1230 n. 6] ("To the extent that a mistaken witness may retain great confidence . . . cross examination can hardly be seen as an effective way to reveal the weakness in a witness' recollection . . . .")

*United States v. Stevens*, 935 F.2d 1380, 1400–1401 (3d. Cir.1991).

▉ The State argues that Dr. Fulero's confidence/accuracy evaluation was directed to the determination of credibility, a unique function of the jury not subject to expert comment. Although the jury is the sole finder of fact, expert testimony may be used to improve the quality of that factfinding process. In our view, given the recognition of Dr. Fulero's expertise, the confidence/accuracy testimony cannot be meaningfully distinguished from the testimony tendered by him on the efforts of stress or cross-racial identification—factors about which the expert was permitted to testify.

The trial court expressed a valid concern that the jury might misinterpret the expert opinion and its application to the case. The danger that the jury would misuse the confidence/accuracy testimony could have been avoided, however, by the standard practices of cross-examination and jury instruction.

In this case, however, we are satisfied that the exclusion of the confidence/accuracy testimony was harmless error. Dr. Fulero presented the jury with expert testimony on the importance of stress, weapon-focus, and cross-racial identification. The jury was therefore alerted to the fact that several factors may have affected the witnesses' perceptions and memory. More importantly, the issue of identification was not a close one. The emphatic identification of Garden by the victim was corroborated by codefendants Hollis and Johnson whose testimony is consistent with other objective evidence in the case, such as the videotape evidence. The jury convicted Garden on all counts except for attempted murder, indicating that they believed that testimony to be true. Finally, reasonable jurors may indeed recognize, even without the aid of an expert, that the certainty expressed by a witness does not guarantee that witness' accuracy. We are satisfied that there is no reasonable doubt that the jury verdict would have been the same if the confidence/accuracy testimony had been admitted.

## VII

▉ Garden next claims as error the trial judge's refusal to give a jury instruction on cross-racial identification—a matter about which Dr. Fulero testified. The proposed instruction would have told the jury "You may consider, if you think it is appropriate to do so, whether the cross-racial nature of the identification has affected the accuracy of the witness' original perception and/or the accuracy of the subsequent identification(s)."

▉ The court denied the request, and instead gave the jury the pattern jury instruction on eyewitness identification. It is not disputed that the pattern instruction given was a correct statement of substantive law. In denying the request for the

alternate instruction, the judge opined that the requested instruction "sounds more like a defense argument," and was thus more appropriately placed before the jury through the arguments of counsel. "This Court reviews the trial court's denial of a requested jury instruction for abuse of discretion so long as the instruction given is a correct statement of the substantive law." *Scott v. State*, 737 A.2d 531 (Del.1999), 1999 WL 652054 *1.

Garden argues that this decision amounted to an abuse of discretion. Garden cites the recent New Jersey case of *State v. Cromedy* as standing for the proposition that a jury instruction on cross-racial identification may be required given the particular facts of a case. 158 N.J. 112, 727 A.2d 457 (1999). Garden argues that, as in Cromedy, there was no forensic evidence linking Garden to the crime, and so the accuracy of the cross-racial identification became a key issue. The State responds that *Cromedy* is distinguishable on its facts. The State also argues that the jury was already aware of the cross-racial issue due to the expert testimony, and that a jury instruction would have been both redundant and inappropriate.

In *State v. Cromedy*, the New Jersey Supreme Court determined that a jury instruction on cross-racial identification may be required under certain circumstances. *Id.* at 459. In *Cromedy*, an African–American defendant was identified by the white victim almost eight months after a rape and robbery. *Id.* at 460. Because no other evidence linked the defendant with the crime, and given the time gap involved, the accuracy of the identification was a key issue. The trial court refused to admit expert testimony on this issue, and also refused to give a relevant jury in-

struction. *Id.* The defendant appealed the jury instruction issue.

The New Jersey court reviewed an impressive mass of social science and legal authority on the issue, and concluded that an instruction was necessary to alert the jury that it should pay close attention to the possible influence of race. *Id.* at 467. The court emphasized that the instruction should be given only when the identification was a critical issue, and there was no corroborating evidence. *Id.* The court reasoned that such an instruction was particularly necessary given that the issue is also within the realm of common sense and thus not open to the assistance of expert opinion. *Id.* at 468.

The trial court did not abuse its discretion in refusing Garden's requested jury instruction. The facts of Garden's case are distinguishable from those of *Cromedy*. Unlike *Cromedy*, Garden was identified by multiple witnesses. The time lapse between the crime and identification was three days for one witness and two weeks for the other witness, rather than seven months. There was also corroborating evidence of Garden's guilt in the testimony of codefendants and in Garden's possession of the proceeds of a similar crime from the previous day. Garden's guilt, in other words, did not hinge exclusively on the cross-racial identification. Even if this Court were to treat this jury instruction issue in the same manner as the New Jersey court, the result would not be different in Garden's case.

Given the factual distinctions between this case and *Cromedy*, we need not decide whether, as a general matter, a jury instruction on cross-racial identification may be necessary under some other circumstances.[3]

---

**3.** This Court recently had occasion to opine on a related aspect of defendant/victim racial

disparity in ruling that a *voir dire* question was required in the selection of a jury in a

Moreover, the *Cromedy* decision rested on the assumption that a jury instruction on cross-racial identification was necessary because expert testimony would not be permitted on what essentially is an issue of common knowledge. This rationale is obviously inapplicable to this case, because Garden was permitted to present expert testimony on the issue.

■■■ The primary function of jury instructions is to inform the jury of the law and its application to the facts as the jury finds them. Presenting the proposition that cross-racial identifications are less likely to be accurate in the context of a jury instruction raises that proposition to the level of a rule of law, which implies a degree of certainty that social science rarely achieves, and comes perilously close to a comment on the evidence contrary to the constitutional restriction. Delaware Constitution of 1897, art IV § 19. Even if the scientific evidence on this issue may be said to be conclusive, that scientific evidence is still more appropriately considered a matter of fact to be presented by an appropriate expert, who can explain the applicability and limitations of the information. Including a jury instruction on the issue does little more than suggest a judicial bias against the reliability of the eyewitness testimony. As the trial court observed, the idea that the jury should consider the expert testimony presented to them is more appropriately conveyed by defense counsel than by the judge.

Given the facts of the case, the trial court was within its discretion in refusing the requested jury instruction.

## VIII

■■■ We next address those claims of error directed to events following the

guilt phase of Garden's trial. The first involves a question of procedure, and since it involves a construction of the death penalty statute is reviewed *de novo*. *Shelton v. State*, 744 A.2d 465, 498 (Del.1999) (construing the breadth of a defendant's right of allocution under 11 *Del.* C. § 4209(c)(2)).

Garden argues that, because the statutory aggravator was established in the guilt phase, the State had no burden at the penalty phase and thus had no right to rebuttal in closing arguments. The State counters that it did carry a burden at the penalty phase, since it still had to prove that the aggravators outweighed the mitigators. The Superior Court rejected Garden's objection to the State's rebuttal on the ground that the statute clearly contemplates that the State is entitled to rebuttal.

The trial court was correct. The statute delineating the procedure for penalty hearings states: "At the hearing the Court *shall* permit argument by the State, the defendant and/or the defendant's counsel, on the punishment to be imposed. Such argument shall consist of opening statements by each, unless waived, opening summation by the State, rebuttal summation by the defendant and/or the defendant's counsel and *closing summation by the State.*" 11 *Del.* C. § 4209(c)(2) (emphasis added). The trial court correctly followed the statute, and Garden's argument to the contrary is meritless.

## IX

The most significant issue in this appeal is posed by the trial judge's rejection of the jury's recommendation by a vote of 10–2, that the mitigating circumstances out-

---

case where the defendant was of a different race than the victim. *See Filmore v. State*, No. 566, 2001, 813 A.2d 1112, (2003), Steele, J. This holding, however, was directed to the

constitutional requirement that the court make "a fair inquiry into the potential of racial prejudice among prospective jurors." (813 A.2d at 1117)

weighed the aggravating circumstances and that the death penalty should not be imposed. Garden contends that the trial judge's override failed to accord appropriate weight to both the jury's role in a capital case and its specific evaluation in the case before it. This claim presents a legal issue of first impression in Delaware: what standards should control the decision of a trial judge to override a jury's recommendation of life imprisonment and impose the death penalty?

The trial court rejected the jury's recommendation of life, stating that their recommendation is not binding and the statute requires only that the court "consider" the jury's recommendation in arriving at its sentencing decision. Mem. Op. at 1, *citing* 11 *Del.* C. § 4209(d)(1). The court further refused to give the jury recommendation great weight, instead giving it "substantial consideration," and rejecting the notion that the jury represents the "conscience of the community." The court explained its disregard of the jury's recommendation thusly: "The advisory verdict, which need not be unanimous, is therefore nothing more than its name implies: an aid to the trial judge in forming the ultimate judgment. In close and difficult cases, it should guide the trial judge to a sentence consistent with the verdict. But it is not a shackle to inhibit the Court from the independent exercise of the duty imposed on it by law." Mem. Op. at 2.

Garden relies on the law of Florida in making his argument, while the trial court found Alabama's contrary approach the better one. Both Florida and Alabama have hybrid death penalty statutes similar to Delaware's, where the jury makes a recommendation, but the judge makes the ultimate decision regarding death. The Florida Supreme Court held that a jury recommendation should be given great weight and that in order to sustain a sentence of death following a jury recommendation of life, "the facts suggesting a sentence of death should be so clear and convincing that virtually no reasonable person could differ." *Tedder v. State*, 322 So.2d 908, 910 (Fla.1975) (cited with approval by the United State Supreme Court in *Proffitt v. Florida*, 428 U.S. 242, 249, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976) and *Dobbert v. Florida*, 432 U.S. 282, 295, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977)). Alabama has specifically rejected the *Tedder* standard. *Ex parte Jones*, 456 So.2d 380, 382 (Ala.1984); *but see Martinez Chavez v. State*, 534 N.E.2d 731, 734 (Ind.1989) (rejecting Alabama's approach and adopting the *Tedder* standard; Indiana is also a hybrid state).

In *Dobbert*, the United States Supreme Court held that Florida's death penalty statute was not an *ex post facto* law because it was ameliorative in nature, noting that the *Tedder* standard was "perhaps the most important" and "crucial protection" available to a defendant sentenced to die, following a jury recommendation of life. *Dobbert*, 432 U.S. at 295, 97 S.Ct. 2290. In *Pennell v. State*, this Court cited *Tedder* favorably, and even applied its standard in upholding the decision of the trial court to impose the death penalty even though a jury had recommended life imprisonment in another case involving the same defendant and murder of other victims. 604 A.2d 1368, 1377 (Del.1992) (stating "[t]his Court finds the *Tedder* analysis didactic, by analogy ..."). Specifically, this Court found that the facts justifying Pennell's death penalty "are so clear and convincing that virtually no reasonable person could differ." *Pennell*, 604 A.2d at 1378.

Delaware's death penalty statute, as redrafted in 1991, was written to emulate Florida's law, which was upheld by the Supreme Court in *Proffitt*.[4] *See State v.*

---

**4.** The 1991 statute was further amended in

2002 in apparent response to the U.S. Su-

Cohen, 604 A.2d 846, 850 (Del.1992); *State v. Steckel*, 708 A.2d 994, 996 (Del.Super.1996); *see also* 68 Del. Laws Ch. 181, Synopsis (stating "this bill generally follows the Florida statute as approved by the United States Supreme Court"). Based on the legislatively established nexus between Florida's death penalty statute and our own, another Superior Court judge adopted the *Tedder* standard. *See State v. Flagg*, 1999 WL 743458, *25, n. 79 (Del.Super.1999) (citing *Tedder*, 322 So.2d 908, 910 and noting that Delaware's death penalty statute generally tracks Florida's, and that Delaware judges have looked to Florida death penalty jurisprudence for guidance).

Although this Court has concluded that a trial judge may completely reject the recommendation of the jury, *Lawrie v. State*, 643 A.2d 1336, 1346 (Del.1994), the cases cited in support of that proposition involved cases where the jury recommended death and the trial judge imposed a life sentence. "When the situation is reversed, there is a far more exacting standard." *State v. Flagg*, 1999 WL 743458, *25, n. 79. Further, allowing the trial judge to disregard the jury recommendation without proper consideration "would render meaningless any jury sentencing recommendation." 1999 WL 743458, *25, n. 79.

■ In our view, given the legislative linkage between the 1991 statute and Florida's then established capital punishment jurisprudence, the *Tedder* standard, should be, and hereby is, adopted. We thus hold that a trial judge must give a jury recommendation of life "great weight" and may

override such a recommendation only if the facts suggesting a sentence of death are so clear and convincing that virtually no reasonable person could differ. This standard would not be contrary to any precedent of this Court. In fact, this Court has often made reference to the "great weight" that jury recommendations are accorded in death penalty cases. *Capano v. State*, 781 A.2d 556, 656 n. 417 (Del.2001) (noting that jury's recommendation was given "great weight"). Furthermore, it recognizes the severe nature of the death penalty in protecting a defendant, who a jury has determined deserves only life in prison, from a judge disposed to a contrary result. If the recommendation of the jury was merely required to be considered, and thus summarily rejected, it would serve little purpose.

Capital juries are instructed that their role is an important one and that their considered recommendation will be entitled to great weight in the judge's ultimate decision. *Cohen*, 604 A.2d at 856 (explaining jury's role as "conscience of the community"); *Capano*, 781 A.2d at 656 n. 417 (noting that jury's recommendation was given "great weight"). That should indeed be the case. There is no evidence that the jury in Garden's case was anything less than conscientious and thorough in its consideration of the mitigating and aggravating circumstances. The trial judge even acknowledged that the jury had discharged its duty well in delivering its "honest and careful" judgment, but nonetheless rejected their decision.

preme Court decision in *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). In view of our remand in this case, we need not consider Garden's attack on the 1991 statute based on *Ring*. This Court recently ruled, however, that a so-called "directed verdict" as to the felony murder aggra-

vating factor based on a jury's finding at the guilt phase of a trial was constitutional under the 1991 statute, and remains constitutional after the 2002 amendment to § 4209. *See Brice and Caulk v. State*, No. 468, 2002, 2003 WL 140046 (Del. Jan. 16, 2003).

Notwithstanding the numerous cases in which this Court, and many others, have referred to the jury as the "conscience of the community," the trial judge in this case rejected the idea as outdated and unrealistic. *See Capano v. State,* 781 A.2d 556, 670 (Del.2001); *Gattis v. State,* 697 A.2d 1174, 1181 (Del.1997); *Jackson v. State,* 684 A.2d 745, 749 (Del.1996); *Ferguson v. State,* 642 A.2d 772, 776 (Del.1994); *Dawson v. State,* 637 A.2d 57, 61 (Del. 1994); *Sullivan v. State,* 636 A.2d 931, 944 (Del.1994); *Wright v. State,* 633 A.2d 329, 335 (Del.1993); *State v. Cohen,* 604 A.2d 846, 856 (Del.1992). The trial court's academic discussion of why the modern capital jury does not reflect the "conscience of the community" misses the point. Defendants are not entitled to a jury representing a perfect cross-section of the community. *Riley v. State,* 496 A.2d 997, 1009 (Del.1985) ("[g]iven the nature of random selection, it is inevitable that a jury may on occasion fail to represent a fair cross-section of the community[;] [10 *Del.* C. § 4501] does not guarantee every defendant a perfectly representative jury."). But a jury reflects the common, non-legal, sensibilities of the general public, as opposed to those of a single judge who may be influenced by his or her daily involvement with crime and its consequences. The decision of whether or not to impose the death penalty is not one within the sole legal province of a judge, but is, and should be, a decision based on community standards of whether, and under what circumstances, the ultimate penalty should be imposed.[5] This Court emphatically recognized the role of the jury in discharging its

"solemn responsibility" in upholding the constitutionality of the 1991 death penalty standards. *State v. Cohen,* 604 A.2d at 856 ("Although not the final arbiters of punishment, jurors still play a vital and important role in the sentencing procedure. The jury sits as the conscience of the community in deciding whether to recommend life imprisonment or the death penalty.")

Of further concern in this case is the risk that the jury was misled in its understanding of the role it would assume in the event its guilty verdict required it to recommend the death penalty. The jury selected to hear Garden's case, consistent with Federal and Delaware law, was "death qualified," *i.e.,* no juror was selected who was so conscientiously opposed to the death penalty as to preclude joining in a recommendation of death. *Id.* at 855. Moreover, in instructing the jury at the conclusion of the sentencing phase the trial judge emphasized their "vital" role as the conscience of the community.

The court charged the jury, in pertinent part as follows:

While the Court has the ultimate responsibility for imposing sentence on the defendant, your role as jurors in the sentencing procedure is vital. Further, the fact that your recommendation in this case does not have to be unanimous should not influence you to act hastily or without due regard to the importance of these proceedings. You, as the conscience of the community, will provide the Court, with an advisory opinion on

---

**5.** *See Spaziano v. Florida,* 468 U.S. 447, 486–87, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984) (Stevens, J., concurring in part and dissenting in part) (arguing that juries make decisions based on community values more reliably than do judges because juries more accurately reflect the composition and experiences of a community as a whole). *See also Ring v.*

*Arizona,* 536 U.S. 584, ——, 122 S.Ct. 2428, 2445, 153 L.Ed.2d 556 (2002) (Scalia, J., concurring) ("We cannot preserve our veneration for the protection of the jury in criminal cases if we render ourselves callous to the need for that protection by regularly imposing the death penalty without it.")

what the jury believes the evidence has shown with regard to the appropriate penalty in this case. You must not take this responsibility lightly. Although the Court is not bound by your recommendation, your recommended answer to the question will be given great weight by the Court in its final determination of the appropriate sentence.

The trial judge's admonition to the jury to act with due regard to the "importance of the proceedings" because they were "the conscience of the community" when viewed from the perspective of his later view of their role is, at the least, misleading, to the extent he may have harbored those reservations when he instructed the jury. It has been long recognized that the jury should not be misled or misinformed concerning the important function they perform in the determination of whether the death penalty should be imposed. *Caldwell v. Mississippi*, 472 U.S. 320, 328–329, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) ("it is constitutionally impermissible to rest a death sentencer on a determination made by a sentence who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere."). In our view, it is equally impermissible to advise the jury—as the trial judge did here—that its determination, conscientiously arrived at, "will be given great weight" when that is not to be the result.

As evidenced by the recent efforts of the Delaware General Assembly in amending 11 *Del.* C. § 4209, the imposition of the death penalty continues to be a matter of national debate, and the fairness of its application a source of concern particularly with respect to the role of the jury. The

current debate and legislative reaction reflect one constant: the jury as the conscience of the community plays a vital role in the determination of whether the death penalty is appropriate in a particular case. Indeed, it is only through service on a jury that the average citizen can voice directly his or her view on the appropriate punishment. That view, particularly when expressed in overwhelming fashion, as it was in this case, should not be lightly rejected.

If, as some contend, the death penalty represents societal retribution, including the jury in the sentencing process serves to reinforce its apparent acceptability among the citizenry.[6] Our approval of the *Tedder* standard should insure that judicial override rests on a more objective basis.

To the extent that the trial judge's imposition of the death sentence failed to give appropriate consideration to the jury's statutory function it is REVERSED. Since the jury correctly performed its role there is no need for a further sentencing hearing. Indeed, the appellant lodges no objection to the jury's findings and recommendations. This matter must be REMANDED, however, to the Superior Court to permit that court to perform its statutory role as the ultimate sentencer, within the standards announced in this decision.

In view of our remand for a new sentencing determination by the trial judge, it is unnecessary for us to consider Garden's claims that the trial judge failed to adequately consider all the mitigating evidence presented during the sentence phase. Nor is it required at this time to conduct a proportionality review as required by 11 *Del.* C. § 4209. Both tasks

---

6. *Gregg v. Georgia*, 428 U.S. 153, 183–184, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) ("[T]he decision that capital punishment may be the appropriate sanction in extreme cases is an expression of the community's belief that certain crimes are themselves so grievous ... that the only ... response may be the penalty of death.").

must await the resentencing required by this decision.

▮ In the interest of finality, and in order to permit the Superior Court to act on remand it is necessary that we consider Garden's claim that the trial judge recuse himself from further proceedings because of events which occurred post-sentencing.

Following Garden's conviction, sentencing, and the filing of this appeal, the trial judge received a letter purportedly written by Christopher Johnson recanting his trial testimony. The trial judge forwarded copies of the letter to counsel for both parties and wrote a responsive letter to Johnson. Garden requested, and was granted, remand from this Court to pursue a motion for a new trial based on Johnson's alleged recantation. On remand, Garden filed a motion for a new trial, based on the letter, and a motion for recusal, based on the trial judge's response to that letter.

The trial judge's responsive letter to Johnson had stated:

Dear Mr. Johnson:

Thank you for your letter concerning the Sadiki Garden case. I have sent copies of it to the prosecutors and to the defense attorneys. There is one small mistake in your letter. That there is no 90 day time limit for the State to do anything more on your case. It is possible that the State will seek to reopen your case on the grounds that you broke your plea agreement by not testifying truthfully and will seek to re-prosecute you for capital murder.

The trial judge then received another letter signed by Christopher Johnson stating that he (Johnson) had never written to the court in question. At Garden's July 27, 2001 hearing on the motion for a new trial, Johnson testified that he had not authored the recantation letter received by the court, nor did he recant his original testimony that Garden was the man who shot Denise Rhudy. It appeared that the style of the recantation letter was significantly different from the many letters that Johnson had admittedly written to the court over the course of his case. The court subsequently denied Garden's motion for a new trial. The trial judge also denied Garden's request that he recuse himself, stating that he had no personal bias against Garden and did not see any appearance of impropriety in his responding to a letter from a prisoner.

Garden argues that he was denied a fair hearing on his motion for a new trial because the trial judge refused to recuse himself after his responsive letter to Johnson "chilled" Johnson's possible recantation testimony. While Garden does not assert any actual bias on the part of the trial judge, he argues that his responsive letter to Johnson created an appearance of impropriety. The State contends that the judge's communication with Johnson was not only proper, but routine, and, because the trial judge was not actually biased, he was within his discretion not to recuse himself.

Even if not actually biased, a judge must also avoid the "appearance of impropriety." *See* Del. Judges Code of Judicial Conduct, Canons 2 and 3C; *Stevenson v. State*, 782 A.2d 249, 255 (Del.2001) (holding that trial judge's actions in requesting the assignment of two murder cases after his participation in a previous suppression hearing at which the victim testified, coupled with the nondisclosure of that request, created an appearance of impropriety which required the trial judge to recuse himself); *but see Los v. Los*, 595 A.2d 381, 384 (Del.1991) (holding that father's naming of trial judge as defendant in federal suit challenging child support formula did not require recusal of trial judge in state child support proceeding).

Although, "[t]he risk that injustice might result from a judge's participation in a proceeding despite the appearance of partiality is particularly acute in a capital murder prosecution where the ultimate fixing of the sentence is in the hands of the trial judge[,]" that risk dissipates if the appearance of impropriety does not arise until after the defendant has been convicted and sentenced. *Stevenson*, 782 A.2d at 258. In this case, Garden had already been sentenced, and had appealed, when the recantation letter was received and the trial judge responded. *Compare MacDonald v. State*, 778 A.2d 1064, 1073 n. 6 (Del.2001) (noting that the Court was "troubled by the trial judge's receipt of information adverse to the interests of a defendant pending sentencing[.]"). Furthermore, the trial judge immediately shared both the recantation letter and his responsive letter to Johnson with counsel for Garden and the State so ·the parties were aware of what the judge knew, and when. *Compare Stevenson*, 782 A.2d at 256 (noting the necessity that the judge disclose any information that could bear on his impartiality).

Although it may have been the more prudent course for the trial judge to have simply acknowledged receipt of the letter and forwarded copies to counsel without commenting on its possible effect on Johnson's future, we find no basis for attributing either bias or the appearance of bias to the judge's subsequent handling of the motion for a new trial.

In summary, upon a careful review of the record we are satisfied that whatever errors occurred in the guilt phase of Garden's trial were harmless beyond a reasonable doubt. Accordingly, the convictions of intentional murder of first degree and felony murder, as well as the related robbery and weapon charges are AFFIRMED. The sentence of death imposed by the Superior Court is REVERSED and the matter REMANDED for further proceedings by the sentencing judge in accordance with this opinion.